2019 IL App (4th) 160598

NO. 4-16-0598

FILED
January 22, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN KELLEY, Defendant-Appellant. | ) Appeal from<br>) Circuit Court of<br>) Champaign County<br>) No. 15CF1128<br>)<br>) Honorable<br>) Heidi N. Ladd,<br>) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justice DeArmond concurred in the judgment and opinion.
Justice Turner specially concurred, with opinion.

**OPINION**

¶ 1    In April and May 2016, defendant, Kevin Kelley, was tried for the first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) of Kelsie R. Blackford, and the jury found him guilty. In July 2016, the trial court sentenced him to imprisonment for 60 years.

¶ 2    Defendant appeals on five grounds.

¶ 3    First, defendant argues that the trial court abused its discretion by admitting Adreian White's testimony as propensity evidence pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2014)) because (1) the events to which White testified bore little "factual similarity to the charged *** offense" (*id.* § 115-7.4(b)(2)) and (2) there was no evidence that defendant committed an "offense *** of domestic violence" against White (*id.* § 115-7.4(a)). Given the evidence, we cannot say that the court's

finding of a factual similarity is unreasonable or arbitrary. As for whether defendant's violence against White, as recounted in her testimony, met the description of domestic violence, he has procedurally forfeited that issue, and the doctrine of plain error, which he invokes, does not avert the forfeiture.

¶ 4 Second, defendant claims that the trial court abused its discretion by admitting Theresa Kane's testimony as further evidence of his propensity to commit domestic violence. See *id.* He likewise argues a lack of factual similarity between her testimony and the charged offense. See *id.* § 115-7.4(b)(2). We disagree that it was unreasonable or arbitrary of the court to find that defendant's violent treatment of one girlfriend, Kane, was comparable to his violent treatment of another girlfriend, Blackford. So, again, we find no abuse of discretion.

¶ 5 Third, defendant complains that the State presented so much propensity evidence as to cause his trial to become a mini-trial on the propensity evidence. We find no abuse of discretion in the quantity of propensity evidence that the trial court allowed. We are unconvinced that the propensity evidence was so extensive as to distract the jury from the issues in the case or to unduly prolong the trial.

¶ 6 Fourth, defendant argues that the trial court abused its discretion by sustaining the prosecutor's relevancy objection when defense counsel tried to elicit testimony from Scott Matthews that a man, street-named Chico, with whom Matthews saw Blackford walking three months before her disappearance was a known drug dealer. The purpose of the testimony would have been to suggest that Chico, instead of defendant, possibly murdered Blackford. We uphold the court's ruling because such testimony would have invited speculation. No evidence connected Chico to Blackford's death.

¶ 7 Fifth, defendant complains that, in the sentencing hearing, the trial court violated the rule against double enhancement by considering, as an aggravating factor, something that already was implicit in the offense of murder, namely, the grief of the victim's family members. Actually, the grief of the victim's family members is not implicit in murder itself but, instead, is a frequent consequence of murder. So, there was no violation of the rule against double enhancement.

¶ 8 Therefore, we affirm the judgment.

¶ 9 I. BACKGROUND

¶ 10 A. The Discovery and Identification of Blackford's Remains

¶ 11 On August 29, 2013, Steven Bebout was fishing on the Sangamon River, in a remote rural area, 397 County Road 2650 North in Newcomb Township, Illinois, when he came upon some human bones near the conjunction of a dried-up tributary and the river. He used his cell phone to call the Champaign County Sheriff's Office.

¶ 12 An investigator with the sheriff's office, Nicki Bolt, found an Illinois identification card among the remnants of a blue sweatshirt, which was beneath the skull. It was Blackford's identification card.

¶ 13 Dental records confirmed that the skeletal remains were those of Blackford.

¶ 14 B. Anthropological Evidence

¶ 15 Cris E. Hughes, a clinical assistant professor of anthropology at the University of Illinois at Urbana-Champaign, testified that she found 29 straight-line incisions on Blackford's bones, as if someone had attempted to dismember her with a knife. Although the cuts were inflicted around the time of death, Hughes was unable to determine how Blackford died. Nor

could Hughes determine exactly when Blackford died; the best she could do was estimate that the date of death was sometime between September 2008 and June 2013.

¶ 16          C. Defendant's Interactions With Blackford, According to His Testimony

¶ 17          Defendant testified that he became acquainted with Blackford in late October 2012, while she was working as a prostitute. She stayed with him a few nights. He denied that they were in an exclusive relationship. He saw her occasionally and helped her out, such as by giving her rides to drug rehabilitation meetings, but he did not see her as often as every week.

¶ 18          Initially, defendant told investigators that he last saw Blackford on November 22, 2012. Later, after having time to think it over, he revised his account, telling them that he last saw her on December 19, 2012. She was with him from December 17 to 19, 2012, and accompanied him to Kenneth Roessler's house, where defendant was putting up Christmas lights.

¶ 19          Erick Dawson testified that on December 18, 2012, he saw Blackford walking outside at night in Urbana, Illinois, in nothing but shorts and a tank top and that he gave her a ride and let her use his cell phone. Blackford texted defendant to meet her at Circle K, a gas station on Cunningham Avenue, because (as she told defendant in the text message) she had been kicked out of the place where she had been staying.

¶ 20          Defendant testified that he picked Blackford up and took her to Cindy Roseman's house, where Roseman gave her three sets of jeans and a pair of socks. After dropping Blackford off at Roseman's house, defendant returned to Roessler's house and resumed hanging Christmas lights. He then picked up Blackford from Roseman's house (according to his testimony), and he could not be sure, but he believed that he and Blackford spent the night of December 18, 2012, together in a hotel.

¶ 21 On December 19, 2012, defendant moved into a rented trailer at 425 East County Road 2725 North, Newcomb Township. In the evening of December 19, he and Blackford bought pseudoephedrine pills from some pharmacies, and afterward, she spent the rest of the evening with him in his trailer.

¶ 22 The trailer was near the Sangamon River. If the ground was dry, it was possible to drive from the trailer, across a pasture, to the river.

¶ 23 D. The Disappearance of Blackford After She Allegedly Took Defendant's

Wallet and Switchblade, and His Efforts to Find Her and Recover His Wallet

¶ 24 Defendant testified that the night of December 19, 2012, was the first and only night he and Blackford spent together in his trailer. He told investigators it was very cold outside that night and that he fell asleep as Blackford was washing dishes and cleaning up the kitchen. When he awoke the next morning, his wallet (which contained $185 in cash), his switchblade, and Blackford were gone.

¶ 25 Because the trailer was "in the middle of nowhere," defendant maintained that there was "no way [Blackford] could have walked anywhere from this trailer." It was his belief (he testified) that she must have used his cell phone to call someone to come and pick her up. The prosecutor asked defendant on cross-examination:

"Q. When you spoke to the detectives, you said [Blackford] must've made some calls but that someone hacked into your phone and deleted them, correct?

A. Correct.

Q. And you said that because you knew when they looked at your phone, there weren't going to be any calls on it, correct?

A. Correct."

¶ 26    After the disappearance of Blackford and his wallet, defendant went to a Verizon store to obtain his phone records and see whether Blackford had called someone from his cell phone and then deleted the call. In the Verizon store, he programmed a newly purchased phone in Blackford's name, and, posing as her, texted various people whom he knew to be her acquaintances. He explained at trial that he did so in an attempt to find Blackford—and his wallet.

¶ 27    After checking his phone records, defendant telephoned several people, including Dawson, to find out if Blackford was with them. Dawson confirmed that he received numerous calls in which a man kept accusing him of being with Blackford. Defense counsel asked Dawson:

> "Q. Did the male accuse you of being with [Blackford] when his wallet was stolen?
>
> A. Yes.
>
> Q. Did he threaten to call the police or anything of that nature?
>
> A. He did."

Annoyed by the calls, Dawson texted back: " 'Dude, I've had it with you. I'm not talking to her. Haven't talked to her. Stop texting me.' "

¶ 28    Defendant testified that he also telephoned Lance Leonard, with whom Blackford used to stay. Defendant claimed at trial that he had seen Blackford's footprints in the snow at Leonard's house after she disappeared. He also claimed to have seen a tire track at Leonard's house that matched one he saw by his trailer.

¶ 29    According to defendant's testimony, he stopped looking for Blackford a couple of days before Christmas 2012 when he found his wallet tucked inside his house slippers, in his

trailer. (He explained that he did not always lock the door of his trailer before leaving.) Defense counsel asked him:

> "Q. When you found your wallet, what was inside it?
>
> A. Everything.
>
> Q. And when you found your wallet, did you discover anything else?
>
> A. There was a note with the wallet."

His switchblade, however, never was returned to him.

¶ 30　　　　Defendant testified that sometime after the return of his wallet, he gathered up Blackford's clothing, including the three pairs of pants Roseman had given her, and put them in a bag to get them out of the way and keep them from getting mixed up with his own laundry. After February 2013, when he was arrested in Indiana, his parents cleaned out the trailer for him and took the bag of Blackford's clothing to their house. The police later obtained the clothing from his parents.

¶ 31　　　　The police interviewed defendant eight times between September 2013 and July 2015. The prosecutor asked defendant:

> "Q. On July 28th of 2015 isn't it true you said to the investigators when they talked to you about the evidence we have just had at trial here, isn't it true you said, ['O]kay, here is what happened. She did a big shot of heroin, I said[,] ["]Kelsie, stop,["] and she jumped over that bridge.['] You said that, correct?
>
> A. I don't recall."

¶ 32　　　　　　　　E. The Testimony of Shane Halsema

¶ 33　　　　Shane Halsema testified that in October 2013, he had a conversation with defendant in the intake dormitory of Putnam Correctional Facility (Putnam), in Lafayette,

Indiana. According to Halsema, defendant told him that he, defendant, had "messed up" and had done something he should not have done: a "call girl" tried to take his money when he had her over at his house, and "things led to other things[,] and he ended up throwing her in the river."

¶ 34    The following day, defendant brought up the conversation from the day before and asked Halsema "not to ever mention it to anybody."

¶ 35    Halsema testified that before defendant confided in him, he had no knowledge of defendant's circumstances or of his case.

¶ 36    Quentim Storm, a correctional officer at Putnam, testified that the intake dormitory lacked access to telephones and televisions.

¶ 37    Defendant acknowledged that he must have told Halsema about his case. Because the case was much on his mind when he was at Putnam, he no doubt talked about his case with fellow inmates. But he denied murdering Blackford.

¶ 38    Halsema denied that he had been promised anything in return for testifying, but he admitted unsuccessfully seeking a deal and threatening to "plead the Fifth" if he did not receive a deal.

¶ 39                    F. The Testimony of Curtiss Wilson

¶ 40    Curtiss Wilson testified that he was in the Champaign County jail for about 2½ months in late 2013 and that in November 2013 he overheard defendant tell some other inmates, before a Bible study, that he, defendant, was suspected of killing a woman north of Mahomet, Illinois; that she had stolen his wallet; and that when she returned, "he beat her up and killed her and put her on his car and drove her to the river."

¶ 41    At the time Wilson overheard defendant tell this story, he did not believe it. Later, however, in August 2015, after Wilson had finished serving his sentence, he was in his

residence, on Florida Avenue in Urbana, and he heard on the news that defendant was suspected of murdering a woman in Mahomet. That was when Wilson told the authorities what he had overheard defendant saying in the Champaign County jail.

¶ 42                          G. Propensity Testimony by White

¶ 43          Adreian White testified she first became acquainted with defendant in roughly 2011. She "was escorting," and he was a client of hers. On about five or six occasions, he paid her to spend time with him. She knew him for about a year and a half, during which she "would see him maybe once a month or he would come and see another girl."

¶ 44          The last time White saw defendant was in the beginning of 2013, in the Motel 6 hotel on Cunningham Street, in Urbana. She and defendant had an understanding that she "was supposed to hang out with him for $250.00 an hour." They lounged in the motel room, conversed, and watched pornography for about three hours. She "didn't have anything to do that day[,] and [she] had seen him quite a bit[,] so [they] were comfortable with each other." Finally, she told him that if they were going to do anything sexual, they should get started because it was long past the time she was supposed to be there. Nothing happened, and defendant did not "want to give [her] the money for [her] to leave," so she got up and walked to a desk, on which he had laid $250, and she helped herself to the cash. Defendant told her, " 'B***, you didn't even do anything,' " whereupon he pushed her onto her back on the bed, climbed on top of her, and choked her with both hands until she dropped the cash. He then grabbed the cash, snatched his car keys and cell phone off the desk, and "shot out of the door."

¶ 45                          H. Propensity Testimony by Kane

¶ 46          To further prove defendant's propensity to commit domestic violence, the State elicited testimony from Theresa Kane that on three occasions defendant was violent toward her.

¶ 47 The first occasion (according to Kane's testimony) was in the summer of 2009, in Indiana. Defendant had made some Rice Krispies squares, and Kane thought they were going on a picnic together. As it turned out, defendant had other plans. When they arrived at a wooded area, he bound her hands, gagged her with a handkerchief, tied her to a tree, and told her he was going to leave her there for the night. As defendant was tying her to the tree, Kane began saying Hail Marys. The prosecutor asked her:

"Q. Did he give you any indication why he did this to you?

A. No. I guess because I was bad, bad people or something, and I need to learn some lesson or something. I don't know."

Defendant returned 1½ to 2 hours later, untied Kane, and took her back to town.

¶ 48 The second incident was during the winter, in either December 2009 or January 2010. From Indiana, defendant drove Kane about a mile into Illinois. He was headed to a house and did not "want [Kane] to know whatever was going on there or maybe people or something." Kane had been staying at a house that "was not far from the house that he was going to," and she suggested to defendant that she "could walk over there *** because it wasn't that far away." He replied to her, " ['I]f you want to walk some place, you can walk from here,['] " or words to that effect, and he had her get out of the truck. Then he drove away, leaving her there, in a deserted area, with no house or building anywhere in sight.

¶ 49 Kane began to walk back to Indiana. She was not dressed warmly enough for the freezing weather. After she had been walking for about an hour, defendant returned. When she saw his truck approaching, she scrambled down, off the road, and hid from him under her white and green coat. He kept screaming her name, but she neither moved nor responded.

¶ 50 Afterward, when Kane arrived on foot at the house in Indiana, "they made a call[,] and they called [defendant] to come get [her]." Defendant arrived and had Kane get in the truck. He "acted like he was all nice," as if he were going to take her home, but, instead, he drove back into Illinois and began beating her inside the cab of the truck and spitting chewing tobacco on her. Then he stopped the truck and "threw [her] into the back of the truck just like a piece of wood" and continued driving. After a while, he stopped at a bridge, pulled her out of the bed of the truck, beat her some more, and dangled her by one leg over the side of the bridge, which was "real[ly] high" above a "waterway." If he had let go, she "would have died or been hurt really badly." She told him she did not want to die. He pulled her up, threw her back onto the bed of the truck, and resumed driving. Just before they arrived in town, he had her get into the front, with him.

¶ 51 The third incident occurred sometime after the other two incidents. Defendant drove Kane to Champaign, Illinois. She testified: "In the vehicle ride, you know, he had scared me enough, he had taken my—cell phone I had was my nephew's[,] and he had taken the battery out of it, and like this one he wanted me to go into this store." It was a pharmacy, and she was supposed to go in and buy pseudoephedrine pills so that defendant could make some money. She went in, but instead of making the required purchases, she told the pharmacy employees that she was afraid that defendant would hurt her, and she asked them if they "could *** just let [her] stay some place *** where he wouldn't have access to [her] until he left or until a ride would come for [her]." They allowed her to stay "behind the camera counter." Eventually, when no ride arrived for her, they asked her to leave.

¶ 52 Kane then walked the streets of Champaign, unsure what to do next. She managed to find the house of some friends of defendant's, Darrell and Cindy Roseman, who lived in

Champaign and whom, on previous occasions, she visited with defendant. Cindy Roseman took Kane "to her sister's place," where Kane stayed "for the day and the night." Then defendant arrived and picked Kane up. As soon as she got in his car, he started punching her, and he asked her where her money was. After driving a few blocks, he stopped the car and forced her to get out and climb into the trunk. Then he closed the trunk and drove on. After about 15 minutes, he stopped and let her out of the trunk.

¶ 53　　　　On cross-examination, Kane testified that all three of the incidents happened in a seven-month period in 2009, when she was dating defendant. The final incident "might have been a little later[,] but he was still coming around and getting [her] in Terre Haute and stuff, even after [they] weren't dating."

¶ 54　　　　　　　　　I. Propensity Testimony by Rodel Williams

¶ 55　　　　Rodel Williams testified that it was he who introduced Blackford to defendant and that the three of them partied together in the winter of 2012 at various locations in Champaign, Illinois, and Terre Haute, Indiana.

¶ 56　　　　Once, when the three of them were driving to Terre Haute, defendant struck Blackford in the face while having an argument with her.

¶ 57　　　　On another occasion, defendant told Williams he had held Blackford "hostage" in a house because she had tried to take his money.

¶ 58　　　　On yet another occasion, Williams and defendant saw Blackford outside a gas station. Defendant jumped out of the car, "choked her up," and threw her in the car "by her neck."

¶ 59　　　　Finally, Williams testified that he once heard defendant threaten Blackford. Specifically, defendant told Blackford that he would kill her if she failed to answer his calls on her phone and that "if [he] ain't going to be with [her], nobody will."

¶ 60　　　　Defendant denied all of Williams's allegations. He denied ever being in the same car with Williams and Blackford.

¶ 61　　　　　　　　　　　J. Propensity Testimony by Kelly Miles

¶ 62　　　　Kelly Miles testified that she became acquainted with Blackford toward the end of 2012, when she, Miles, was living in Bay Harbor Apartments in Champaign. A couple of times a week for about two months, Miles and Blackford "did some drugs together"—heroin, which Blackford brought over.

¶ 63　　　　When Miles first met defendant, he described Blackford to her and offered to pay Miles $100 if she called him when she saw Blackford "in the building complex." Miles testified: "They got together[,] but they had seen each other before[,] and he really liked her, and he did pay me the hundred dollars."

¶ 64　　　　"Maybe October" 2012, but, in any event, sometime after defendant paid Miles the $100, Miles noticed that Blackford "had bruising on her face." Blackford told Miles that defendant "did it." Afterward, Miles had two conversations with defendant about what Blackford had told her. During these conversations, Miles "was with him in his car in the country." The prosecutor asked Miles:

> "Q. Around that time what was your relationship with the defendant?
>
> A. I would go get boxes of pills for him.
>
> Q. At drug stores?
>
> A. Yeah."

¶ 65        The first time Miles confronted defendant about what Blackford had told him, "he denied it." About a month later, Miles brought up the subject again, and he "finally admitted *** that all of it was true."

¶ 66        The prosecutor then told Miles:

"Q. Now I would like you to tell the jury, when you asked [Blackford] how she got those injuries, what she told you happened.

A. She told me she was at his trailer, whatever, and he got angry and that he had hit her and he duct taped her feet and her hands and left her like that for a long time.

Q. Did she say anything about how she got away?

A. He had finally released her[,] and she came to my apartment, and that's how we had that conversation.

Q. Did you see her again after that?

A. I don't believe so."

¶ 67        K. The Exclusion of Evidence That Chico Was a Known Drug Dealer

¶ 68        The defense called Scott Matthews as a witness. He testified that in September 2012 he saw Blackford "walking down [State Street] with an African American guy." Defense counsel asked Matthews if he had recognized the man, and Matthews answered in the affirmative. Defense counsel then asked Matthews:

"Q. And how did you recognize this man?

MR. SULLIVAN [(prosecutor)]: Objection, Your Honor.

THE COURT: Sustained. If you want to ask his name, you may.

Q. Do you know this gentleman's name?

A. I don't know him by his legal name, but—

Q. Did you know him by a street name?

A. Yeah. It was Chico."

¶ 69     Matthews further testified that in 2012 he became aware that Blackford "had a drug addiction issue." In November 2012, she had sores on her face and looked malnourished, leading him to infer that she was using drugs.

¶ 70     Later, after adjourning the trial for the day, the trial court provided the following clarification for the record:

"[At a sidebar conference, I had stated] I would permit the fact that [Blackford] had used drugs to come in because that door has been opened by the State and testified to by multiple witnesses, but not the fact that she had been seen with a drug dealer, which was what [defense counsel] represented she intended to elicit from the witness, that when the witness had seen her, that time with a man he recognized, that that was a known drug dealer."

¶ 71     L. The Trial Court's Consideration, as an Aggravating Factor, That

the Murder of Blackford Caused Great Sorrow to Her Family

¶ 72     In the sentencing hearing, the trial court stated:

"[T]here's an impact on the survivors, and it is evident from the victim impact statement that was read here in court that it is a sizable and immeasurable pain that they are suffering, and will continue to feel the loss of. The court will not denigrate that by reiterating the statement we've just heard, but it's apparent that Ms. Blackford's death at age 23 has left a vacuum for her family, for her parents, and for her son. The knowledge that the family has as to the circumstances of her

- 15 -

death and how her remains were treated is something that they'll have to bear as well, and that exceeds what would be inherent in the definition of murder itself."

¶ 73                                II. ANALYSIS

¶ 74        A. The Admission of White's Testimony as Propensity Evidence

¶ 75        The trial court admitted White's testimony as propensity evidence. Defendant contends that the court thereby abused its discretion. See *People v. Heller*, 2017 IL App (4th) 140658, ¶ 45.

¶ 76        In addressing that contention, we begin with the text of the statute on which the trial court relied as authority for admitting White's testimony. Subsections (a) and (b) of section 115-7 of the Code (725 ILCS 5/115-7.4(a), (b) (West 2014)) provide as follows:

        "(a) In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of [s]ection 103 of the Illinois Domestic Violence Act of 1986 [(Act) (750 ILCS 60/101 *et seq.* (West 2014))], or first degree murder or second degree murder when the commission of the offense involves domestic violence, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.

        (b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

                (1) the proximity in time to the charged or predicate offense;

                (2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances."

¶ 77        "Undue prejudice" within the meaning of section 115-7.4(b) necessarily is prejudice other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common-law ban on that particular kind of propensity evidence. See *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010); *People v. Walston*, 386 Ill. App. 3d 598, 619-20 (2008) ("[N]ot only is other-crimes evidence offered to show propensity no longer *per se* unfairly prejudicial, it is actually proper."). "[O]ther-crimes evidence admitted pursuant to section 115-7.4 *** may be considered by the jury for any relevant matter, including the defendant's propensity to commit the charged crime" (*Heller*, 2017 IL App (4th) 140658, ¶ 65), even though, at common law, such propensity evidence would have been inadmissible (*Dabbs*, 239 Ill. 2d at 288).

¶ 78        Defendant argues, however, that, by the very terms of section 115-7.4, it was an abuse of discretion to admit White's testimony as propensity evidence. According to defendant, two provisions of section 115-7.4 stood in the way of admitting her testimony: (1) the events to which she testified had little "factual similarity to the charged *** offense" (725 ILCS 5/115-7.4(b)(2) (West 2014)) since the nature of defendant's relationship with White was "entirely different" from the nature of his relationship with Blackford, and (2) there was no evidence that defendant committed an "offense *** of domestic violence" against White (*id.* § 115-7.4(a)).

¶ 79                                1. *Factual Similarity*

¶ 80        Although defendant first became acquainted with Blackford by buying sexual services from her, he told investigators that he had developed a dating relationship with her and that he was in love with her. Because he associated with White, by contrast, merely to buy sexual services from her, he argues he had a strictly business relationship with White whereas he had a

- 17 -

romantic relationship with Blackford. Both White and Blackford were prostitutes, it is true, but Blackford had become his girlfriend whereas White remained, to him, merely a prostitute. Thus, he maintains that the trial court erred by "finding a degree of factual similarity between White's statement and the charged offense."

¶ 81    The State responds that defendant's relationship with Blackford must not have been purely romantic, considering that, by defendant's own admissions to fellow prisoners, he killed Blackford in retaliation for taking his money and that if she took his money, she must have felt entitled to compensation—or, as the trial court put it, she still must have been "partially *** an escort." Blackford collected payment by running away with defendant's wallet, and defendant physically retaliated. Similarly, the State observes, anger at the taking of his money as compensation for services motivated defendant to lay violent hands on White.

¶ 82    Regardless of whether defendant was more romantically involved with Blackford than with White, both women took money from him after spending time with him, and he responded with extreme violence. Thus, we are unable to say it was arbitrary, fanciful, or unreasonable to draw a parallel between defendant's violence against White and his violence against Blackford. See *People v. Donoho*, 204 Ill. 2d 159, 182 (2003) ("We will find an abuse of discretion if the trial court's evaluation is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.)). The comparison has some basis in the evidence. Arguably, defendant had a propensity to become violent toward female sexual partners who took his property. Therefore, we find no abuse of discretion in the trial court's evaluation of factual similarities between White's testimony and the charged offense. See 725 ILCS 5/115-7.4(b)(2) (West 2014)); *Heller*, 2017 IL App (4th) 140658, ¶ 45.

¶ 83            2. *An Offense of Domestic Violence Against White*

¶ 84            A lack of factual similarity is not the only argument that defendant makes against the admission of White's testimony. See 725 ILCS 5/115-7.4(b)(2) (West 2014). He also argues that a condition in section 115-7.4(a) was unmet: he disputes that his alleged offense against White was one of domestic violence.

¶ 85            To be admissible under section 115-7.4, the propensity evidence must be the defendant's commission of another offense of domestic violence. Again, section 115-7.4(a) provides as follows:

> "In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of [s]ection 103 of the *** Act *** [(750 ILCS 60/103(1), (3) (West 2014))], or first degree murder or second degree murder when the commission of the offense involves domestic violence, evidence of the defendant's commission of *another offense or offenses of domestic violence* is admissible, and may be considered for its bearing on any matter to which it is relevant." (Emphasis added.) *Id.* § 115-7.4(a).

Defendant argues that by allegedly battering White in the motel room, he could not have committed an offense of domestic violence, because domestic violence can be committed only against a "family or household member[ ]" as defined by section 103(6) of the Act (750 ILCS 60/103(6) (West 2014)) and White, in defendant's view, did not meet the definition of a "family or household member[ ]."

¶ 86            The State responds that defendant has forfeited this contention because, in the trial court, he made entirely different objections to White's propensity testimony, namely, a lack of "factual similarity to the charged *** offense" (725 ILCS 5/115-7.4(b)(2) (West 2014)), the

risk of prejudice, the prevention of a mini-trial on propensity evidence, and the need for more than mere suspicion. He never argued a lack of evidence that he committed an "offense *** of domestic violence" against White (*id.* § 115-7.4(a)). A specific objection forfeits all other, unspecified objections. *People v. Macri*, 185 Ill. 2d 1, 75 (1998).

¶ 87          Defendant concedes that by disputing, on appeal, that he committed an offense of domestic violence against White, he raises a new objection to her testimony, an objection he never raised in the trial court. He argues, however, that the doctrine of plain error should avert the forfeiture because the evidence in the trial was closely balanced. See *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 88          As the supreme court explained in *Sebby*, there are two alternative theories, or "prongs," of plain error: (1) a clear or obvious error was made, and the evidence was so closely balanced that the error alone threatened to tip the scales against defendant, regardless of the seriousness of the error; or (2) a clear or obvious error was made, and the error was, in itself, so serious, so inherently grave, that, regardless of the closeness of the evidence, the error made the trial unfair to defendant and threatened the integrity of the judicial process. *Id.* In the present case, defendant invokes only the first prong of the plain-error doctrine. "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Id.* ¶ 51.

¶ 89          Defendant has failed to make such a showing. Given the other highly damaging propensity evidence—including, but not limited to, the repeated beatings that defendant inflicted on Kane, his dangling her by one leg off the side of a bridge, and his act of binding and gagging Blackford with duct tape and leaving her in his trailer for a day—it is implausible that

subtracting the single violent incident with White would have made any difference in the verdict. After all, defendant confessed to Halsema and Wilson. Defendant calls both of these men jailhouse informants, but Wilson really does not neatly fit that description. It was only *after* Wilson had fully served his sentence—when he no longer had anything to gain and had no apparent incentive to lie—that he went to the police and recounted defendant's admission that he had murdered a woman for stealing his wallet and had thrown her body into a river. And, indeed, Blackford's remains were found on the riverbank, in Newcomb Township, the township in which defendant lived. He had impersonated her in text messages in a furious effort to find her. He lied to the police about when he last saw her. Williams had heard him tell Blackford that if he, defendant, could not have her, no one could. Against the backdrop of all that evidence, the single incident in which defendant choked White until she dropped his cash shrinks into relative insignificance and, by any realistic view, could not have tipped the scales of justice. See *id.*

¶ 90        Therefore, we are unconvinced that the doctrine of plain error should avert the procedural forfeiture of defendant's argument that White was not a "family or household member[ ]" within the meaning of section 103(6) of the Act (750 ILCS 60/103(6) (West 2014)). See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). "When a defendant fails to establish plain error, the result is that the procedural default must be honored." (Internal quotation marks omitted.) *Id.*

¶ 91            B. The Admission of Kane's Testimony as Propensity Evidence

¶ 92        To further prove defendant's propensity to commit domestic violence, the State elicited testimony from Kane that on three occasions defendant used violence against her. In defendant's view, "the degree of factual dissimilarities between [Kane's] testimony and the charged offense rendered the evidence more prejudicial than probative." He points out that under

*Donoho*, 204 Ill. 2d at 184, other-crimes evidence offered pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2014)) must have "some threshold similarity to the crime charged." (Internal quotation marks omitted.) He argues that Kane's testimony, like the testimony of the propensity witness in *People v. Johnson*, 406 Ill. App. 3d 805 (2010), lacks a threshold similarity to the offense with which he was charged: the first degree murder of Blackford.

¶ 93        In *Johnson*, the State charged the defendant with the aggravated criminal sexual assault and aggravated kidnapping of T.W. *Id.* at 805-06. In the jury trial, T.W. testified that the defendant grabbed her as she was walking past an alley and that he dragged her into an abandoned building, threatening to kill her if she did not do what he said. *Id.* at 806. He demanded that she perform fellatio on him, but she replied that she was so scared that she might bite him. *Id.* He pushed her against a wall and inserted his finger and then his penis into her vagina. *Id.* After he was finished, he fled. *Id.*

¶ 94        In the jury trial in *Johnson*, the State also presented the testimony of a propensity witness, C.V., pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2006)). *Johnson*, 406 Ill. App. 3d at 807-08. That section, subject to certain conditions, allowed the admission of evidence that the defendant had a propensity to commit sexual offenses. See *id.* at 809. Subsection (c) of section 115-7.3 (725 ILCS 5/115-7.3(c) (West 2006)) was identical in its wording to subsection (b) of section 115-7.4 (725 ILCS 5/115-7.4(b) (West 2014)), the propensity statute in the present case. Section 115-7.3(c) provided:

> "(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> > (1) the proximity in time to the charged or predicate offense;

(2) *the degree of factual similarity to the charged or predicate offense*; or

(3) other relevant facts and circumstances." (Emphasis added.) 725 ILCS 5/115-7.3(c) (West 2006).

Thus, in an analysis under section 115-7.3(c), as in an analysis under the identically worded section 115-7.4(b) (725 ILCS 5/115-7.4(b) (West 2014)), the account of the propensity witness had to be compared to the account of the present alleged victim.

¶ 95 C.V., the propensity witness in *Johnson*, testified substantially as follows. She was walking home when a car pulled into an alley and blocked her way. *Johnson*, 406 Ill. App. 3d at 807. The defendant got out of the passenger side of the car and asked her for directions. *Id.* at 807-08. He then pulled her into the back seat of the car and started removing her clothes. *Id.* at 808. When she tried to get out of the car, the defendant hit her on the temple and warned her not to scream or else he would kill her. *Id.* The other man drove the car down the alley and to a dark, abandoned building. *Id.* The two men pulled C.V. from the car and into the building, where the defendant removed C.V.'s clothing. *Id.* The driver stuck his penis into C.V.'s mouth, and the defendant stuck his penis into her anus. *Id.* The defendant orally, anally, and vaginally penetrated her, and during the sexual assault, he gave her alcohol and blew cocaine into her face. *Id.* She had an asthma attack and blacked out. *Id.* When she regained consciousness, the defendant and the other man were gone. *Id.*

¶ 96 While acknowledging "general similarities between T.W.'s assault and C.V.'s assault," the Second District in *Johnson* noted the following dissimilarities:

"One of the most telling differences between the two assaults was the number of perpetrators involved in each instance. C.V. testified she was sexually

- 23 -

assaulted by defendant and an unidentified black male. T.W., on the other hand, testified defendant was the only attacker during her assault. C.V. testified defendant used a car during the assault, blew cocaine in her face and gave her alcohol during the assault, and anally penetrated her—three circumstances that differ from T.W.'s assault testimony. Neither victim testified at trial to seeing a weapon." *Id.* at 811.

¶ 97 The Second District then discussed *People v. Holmes*, 383 Ill. App. 3d 506 (2008), in which the First District concluded that two sexual assaults—the charged one and the propensity evidence—"did not share enough general similarities to make the 1996 conviction sufficiently probative to prove propensity under section 115-7.3." *Johnson*, 406 Ill. App. 3d at 811-12. Apparently, the Second District was unaware that, the previous year, the supreme court vacated *Holmes*. See *People v. Holmes*, 235 Ill. 2d 59, 62 (2009); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 66 (2006) (an appellate decision vacated by the supreme court "carries no precedential weight").

¶ 98 After discussing the (vacated) appellate decision in *Holmes*, the Second District raised what it perceived as "another problem with the propensity evidence here: the trial judge analyzed only the probative value of the other-crimes evidence during the pretrial hearing on the State's motion to admit." *Johnson*, 406 Ill. App. 3d at 812. The trial court "never considered the other side of the scale," namely, "whether the risk of unfair prejudice substantially outweighed the probative value of the evidence." *Id.* The supreme court had exhorted trial courts " 'to be cautious in considering the admissibility of other-crimes evidence to show propensity[,] by engaging in a meaningful assessment.' " *Id.* (quoting *Donoho*, 204 Ill. 2d at 186).

¶ 99 The Second District wrote in *Johnson*:

"The existence of significant dissimilarities between the two assaults, combined with the trial court's failure to conduct any sort of 'meaningful' analysis of the prejudicial effect of the other-crimes evidence, leads us to say the trial court erred in admitting the other-crimes evidence to establish [the] defendant's propensity to commit sexual offenses. See *Donoho*, 204 Ill. 2d at 186; *Holmes*, 383 Ill. App. 3d at 518-19." *Johnson*, 406 Ill. App. 3d at 812 (quoting *Donoho*, 204 Ill. 2d at 186).

(The Second District nevertheless found the error to be harmless. *Id.* at 819.)

¶ 100    We disagree with *Johnson* that the trial court in that case abused its discretion (see *id.* at 808) by admitting C.V.'s testimony as propensity evidence under section 115-7.3. We do not see, nor does the Second District explain, *why* the factual dissimilarities between the sexual assault upon T.W. and the sexual assault upon C.V. were "significant" (*id.* at 812), given the legislative intent in section 115-7.3.

¶ 101    The legislature intended to make it permissible, in cases of alleged sexual offenses, for the State to adduce evidence that the defendant had a propensity to commit sexual offenses—but the admissibility of such propensity evidence depends on the fulfillment of the conditions set forth in section 115-7.3. *Donoho*, 204 Ill. 2d at 176. One of those conditions is that the trial court "[weigh] the probative value of the evidence against undue prejudice to the defendant." 725 ILCS 5/115-7.3(c) (West 2014).

¶ 102    The qualifier "undue" is crucial because prosecuting the defendant necessarily entails adducing evidence prejudicial to the defendant. See *id.* All propensity evidence aims to be prejudicial to the defendant. The prejudice, however, is undue if the propensity evidence is calculated to persuade the jury to return a guilty verdict only because the defendant supposedly is

- 25 -

a bad person who, in any event, deserves to be punished. *People v. Smith*, 406 Ill. App. 3d 747, 751 (2010). If that were the use to which the so-called "propensity evidence" were put, it really would not even be propensity evidence; the strategy would be to obtain a guilty verdict not on the reasoning that the defendant's badness predisposed him to commit the charged offense but, rather, on the quite different reasoning that because the defendant is bad, he deserves whatever punishment can be heaped upon him—*regardless* of whether he committed the charged offense. See *Walston*, 386 Ill. App. 3d at 614-15 & n.5.

¶ 103　　　　To be admissible under section 115-7.3, the evidence has to be, genuinely, propensity evidence—and not only that, but a particular kind of propensity evidence. Section 115-7.3 only partly lifts the ban on propensity evidence. If all the propensity evidence does is prove the defendant's propensity to do bad things in general, it remains inadmissible (see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)); the propensity evidence must more narrowly tend to prove the defendant's propensity to commit sexual offenses (see 725 ILCS 5/115-7.3(b) (West 2014)).

¶ 104　　　　There are, of course, different sexual offenses, and just because a defendant has, for example, a history of exposing himself, it would not necessarily follow that he has a propensity to commit sexual assault. Thus, the trial court must consider "the degree of factual similarity to the charged or predicate offense" (*id.* § 115-7.3(c)(2)) to determine the extent to which the testimony offered as propensity evidence really tends to prove a propensity to commit the *charged* sexual offense.

¶ 105　　　　The foregoing exposition of section 115-7.3—which is applicable, by analogy, to section 115-7.4—leads us to our point of disagreement with *Johnson*. We do not see how the factual dissimilarities that the Second District identified in *Johnson* have any logical relevance to the question of whether the defendant in that case did or did not have a propensity to commit

sexual assault. If on one occasion he committed sexual assault with the assistance of someone else and on the next occasion he committed sexual assault unassisted, the previous occasion still would be evidence that he had a propensity to commit sexual assault. The same would be true if on the previous occasion the defendant used a car and on the next occasion he did not do so or if on the previous occasion he blew cocaine into the victim's face and on the next occasion he did not do so. Such factual differences are incidental and meaningless unless the identity of the perpetrator is at issue and the State pursues a theory of *modus operandi*, the proof of which always requires "a high degree of identity between the facts of the crime charged and [those of] the other offense." (Internal quotation marks omitted.) *People v. Cruz*, 162 Ill. 2d 314, 349 (1994). But "[w]here such evidence is not being offered under the *modus operandi* exception, more general areas of similarity will suffice to support admissibility." (Internal quotation marks omitted.) *Donoho*, 204 Ill. 2d at 184. In short, the objective under section 115-7.4(b)(2) is not to identify factual differences just for the sake of identifying factual differences. The differences have to logically matter; they have to be relevant, in a commonsensical way, to the probative value of the previous offense as propensity evidence.

¶ 106        In the present case, we are unable to say the trial court abused its discretion (see *id.* at 168)—or, in other words, that the court made a decision that was unreasonable or clearly against logic (see *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000))—by deciding that defendant's acts of violence against Kane tended to prove his propensity to commit the charged offense against Blackford. Both Kane and Blackford were his girlfriends, he brutalized them both, and it especially raised his ire when they attempted to flee from him. He appeared to be on the verge of killing Kane when he dangled her by one leg over the side of a bridge. Arguably—and we say "arguably" because our standard of review is the

most deferential standard of review known to the law (see *People v. Radojcic*, 2013 IL 114197, ¶ 33)—the factual differences do not greatly reduce the probative value of Kane's testimony. It was all extreme domestic violence. Therefore, we find no abuse of discretion in the admission of Kane's testimony as propensity evidence under section 115-7.4 of the Code.

¶ 107 In so finding, we acknowledge that, at one point in its rationale, the trial court compared the factual similarities between two sets of propensity evidence instead of comparing the propensity evidence "to the charged *** offense." 725 ILCS 5/115-7.4(b)(2) (West 2014). The court noted that just as defendant took Kane "out into the country" and left her "bound to a tree" for up to two hours, he tied up Blackford and left her for a day in his trailer, out "in the middle of nowhere," when the weather was freezing. Section 115-7.4(b)(2) provides that "[i]n weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider *** the degree of factual similarity *to the charged or predicate offense*," not the degree of factual similarity to other propensity evidence. (Emphasis added.) *Id.* Nevertheless, "the question before us on appeal is the correctness of the result reached below, rather than the correctness of the reasoning upon which that result was reached." *People v. Burchell*, 2018 IL App (5th) 170079, ¶ 9. It appears from Kane's testimony that defendant was possessive and controlling toward his girlfriends and that he tended to become violent toward them when they did anything that challenged his assumed right of possession and control. One might infer that he murdered Blackford not only because she stole his wallet but also because she ran away from him and tried to free herself from his domination. Defendant's violent rage at being defied and evaded by his girlfriends arguably is a significant point of similarity between Kane's testimony and the charged offense.

¶ 108 C. Defendant's Complaint That There Was a Mini-Trial on Propensity Evidence

¶ 109    Defendant argues that "Kane's testimony was wholly unnecessary considering that Williams's and Miles's testimony was properly admitted as other-crimes evidence." Defendant is concerned that "by hearing Kane's additional allegations of domestic violence against [him], the jury was invited to conduct mini-trials about those other bad acts, rather than to focus on the conduct actually charged." He cites *Walston*, 386 Ill. App. 3d at 620, for the proposition that "a 'mini-trial' of a collateral offense can cause undue prejudice."

¶ 110    The Second District explained in *Walston* that the State's presentation of propensity evidence amounted to a mini-trial only if the propensity evidence was so overabundant as to "cause jury confusion or unnecessary delay." *Id.* We are unconvinced that the propensity evidence in this case was so great in quantity as to "distract the jury or unduly prolong the trial." *Id.* at 622.

¶ 111    D. The Refusal to Allow Testimony That Chico Was a Known Drug Dealer

¶ 112    Defendant claims that the trial court abused its discretion by refusing to allow him to elicit testimony from Matthews that Chico was a known drug dealer. It appears that the trial court regarded Chico's supposed reputation as a drug dealer to be irrelevant. The State's objection was general ("Objection, Your Honor"), and a general objection is construed as being only to the relevancy of the proffered evidence. See *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 107 (Gordon, J., specially concurring); *Cerveny v. American Family Insurance Co.*, 255 Ill. App. 3d 399, 410 (1993); *People v. Buie*, 238 Ill. App. 3d 260, 275 (1992). Therefore, the only question before us is whether the court abused its discretion by ruling it was irrelevant that Chico was a known drug dealer. See *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 66.

¶ 113    Defendant argues that Blackford's being seen, three months before her disappearance, with a known drug dealer was relevant because the defense may attempt to prove

that someone else committed the crime with which the defendant is charged. See *People v. Ward*, 101 Ill. 2d 443, 455 (1984). To be sure, the defense has that right, but as the supreme court cautioned in *Ward*, that right "is not without limitations." *Id.* "[I]f the evidence is too remote or too speculative, or if it fails to link a third person with the commission of the crime, then the trial court should exclude the evidence." (Internal quotation marks omitted.) *Upshaw*, 2017 IL App (1st) 151405, ¶ 66.

¶ 114        We are unable to say it was unreasonable and arbitrary of the trial court to rule that Blackford's being seen in Chico's presence three months before her disappearance was insufficient to link Chico to her murder, even if Chico was a known drug dealer. See *People v. Eagletail*, 2014 IL App (1st) 130252, ¶ 26. It would have been nothing more than speculation to suggest to the jury that Chico possibly murdered Blackford simply because Chico was a drug dealer, she was a drug user, and several months before her disappearance she was seen walking with him. See *Upshaw*, 2017 IL App (1st) 151405, ¶ 66. Therefore, we find no abuse of discretion in the sustaining of the prosecutor's relevancy objection. See *id.*; *McCoy*, 2016 IL App (1st) 130988, ¶ 107.

¶ 115            E. The Pain to Blackford's Family, as a Factor in Aggravation

¶ 116        It is a rule of statutory construction that, unless the statute clearly states otherwise, "a factor implicit in the offense for which [the] defendant is convicted cannot be used as an aggravating factor at sentencing." *People v. Rissley*, 165 Ill. 2d 364, 390 (1995). Defendant argues that, in his sentencing hearing, the trial court violated this rule against double enhancement by considering, as an aggravating factor, the pain that Blackford's murder caused to her family. He reasons that the loss felt by the victim's family is "a loss that is felt in every murder" and, thus, is implicit in the offense of murder and the trial court should not have

considered it. He compares his case to *People v. Dowding*, 388 Ill. App. 3d 936 (2009), and *People v. Joe*, 207 Ill. App. 3d 1079 (1991), in which the appellate court held that the trial court had erred by considering, as an aggravating factor, the death of the victim (*Dowding*, 388 Ill. App. 3d at 943-44) and the serious harm to the victim (*Joe*, 207 Ill. App. 3d at 1086).

¶ 117    The comparison to *Dowding* and *Joe* is inapt because "implicit" means "always to be found in" (New Oxford American Dictionary 853 (2001)), not "often resulting from." The death of the victim and serious harm to the victim are implicit in—that is, are always to be found in—the offense of murder. By contrast, the grief of surviving family members, though a common result of murder, is not implicit in murder itself. The murder victim might have no family, or the family might be indifferent. A deleterious effect on the murder victim's family is a frequent consequence of murder, not something inherent in murder itself. Thus, there was no double enhancement.

¶ 118                              III. CONCLUSION

¶ 119    For the foregoing reasons, we affirm the trial court's judgment, and we award the State its $50 statutory assessment against defendant as costs of this appeal (see 55 ILCS 5/4-2002(a) (West 2016)).

¶ 120    Affirmed.

¶ 121    JUSTICE TURNER, specially concurring:

¶ 122    While I agree with the affirmation of the trial court's judgment, I write separately for the limited purpose of noting my objection to the majority expressing its opinion the Second District wrongly decided *Johnson*. *Supra* ¶¶ 100, 105. I am disinclined to outright reject a decision from a unanimous panel of a sister appellate district unless it is necessary. See *People v. Burlington*, 2018 IL App (4th) 150642, ¶ 32, 99 N.E.3d 577 (addressing a case by another

district that reached the opposite conclusion in interpreting the very same statutory language). Here, it is not necessary. In my view, the majority concisely and convincingly explains why the trial court properly admitted into evidence Kane's propensity testimony. *Supra* ¶¶ 106-07. Although I have no problem with distinguishing *Johnson* and contrasting its analysis to our own, I do not subscribe to finding the *Johnson* court's judgment was unsound. Thus, I specially concur.