NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220468-U

NO. 4-22-0468

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Brown County |
| JOHN MICHAEL DEAN, | ) | No. 19CF10 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles H.W. Burch, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice DeArmond and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*: The State's evidence was sufficient to prove beyond a reasonable doubt defendant committed first degree murder, the trial court did not err by denying defendant's reckless conduct instruction and in making evidentiary rulings, and defendant failed to establish plain error occurred during sentencing.

¶ 2   On June 27, 2019, the State charged defendant, John Michael Dean, with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) for the death of Rebecca Niewohner. After a December 2021 trial, a jury found defendant guilty. Defendant filed a motion for an acquittal or, in the alternative, for a new trial. Defendant amended his posttrial motion, and after a hearing, the Brown County circuit court denied the amended posttrial motion. At a February 2022 hearing, the court sentenced defendant to 65 years' imprisonment, which included a 25-year firearm enhancement. Defendant filed a motion to reconsider his sentence, which the court denied.

¶ 3        Defendant appeals, contending (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of first degree murder, (2) the trial court erred by refusing to give a lesser included offense instruction on reckless conduct, (3) he was deprived of a fair trial due to cumulative evidentiary errors, and (4) the court erred in determining defendant's sentence.  We affirm.

¶ 4                        I. BACKGROUND

¶ 5        The State's sole charge alleged, on June 14, 2019, defendant, without lawful justification and with the intent to kill, shot Rebecca with a .45-caliber handgun (firearm) causing her death.  At around 9:10 p.m. that night, Jeremy Huston had received a call from defendant, in which defendant stated he had shot Rebecca and he was going to join her.  Jeremy and defendant's father, John Robert Dean, were the first to arrive at defendant and Rebecca's residence in Mt. Sterling, Illinois.  They observed Rebecca lying in a pool of blood and defendant kneeling with his face in his hands.  Jeremy moved defendant's firearm from the living room floor to the kitchen counter.  Officer Nathan Rauch was the first police officer on the scene, and he arrived shortly before the paramedics.  Officer Rauch's squad car had a dash camera and a backseat camera.  The dash camera captured Officer Rauch's statements, even when he was not next to the car.  Officer Rauch took the firearm to his squad car, where he unloaded it and secured it inside the squad car.  The paramedics took defendant to the hospital, where he recovered from his injuries.  The coroner declared Rebecca dead at 9:59 p.m.

¶ 6        At some point, Officer Rauch left to obtain a search warrant.  The complaint for the search warrant stated he had located the firearm and "secured it."  It also asserted Officer Rauch's opinion defendant took Rebecca's life and then attempted to take his own.  The trial court issued the search warrant for defendant and Rebecca's residence at 11:45 p.m.  Around

4:30 a.m. on June 15, Officer Rauch gave the firearm to Brandi Field, a crime scene investigator with the Illinois State Police, inside the residence. Later, Larry Hood, defendant's forensic consultant, obtained the firearm and transported it to a forensic laboratory for DNA testing. The DNA evidence report for the firearm was dated November 18, 2020. The report noted Rebecca's DNA was not found on the firearm, but defendant's DNA was found.

¶ 7    In September 2020, defendant filed a motion *in limine* seeking to prohibit the admission of the DNA test results on the firearm. Defendant asserted the DNA on the firearm had been intentionally or unintentionally tampered with because it was handled by Jeremy, Officer Rauch, and Trooper Field. Defendant later filed an amended motion adding an alternative request for relief. Specifically, he requested he be allowed to withdraw his stipulation to the chain of evidence for the firearm and any evidence derived from it.

¶ 8    On December 3, 2021, the trial court held an evidentiary hearing on defendant's amended motion *in limine*. Defendant presented the testimony of Mt. Sterling Police Chief Brandon Norris, Trooper Field, and Officer Rauch. He also played the recordings from Officer Rauch's squad car. At the conclusion of the hearing, the court denied defendant's request to bar the DNA evidence from the firearm but did allow defendant to withdraw the stipulation to the chain of custody. During trial, defendant made a motion to reconsider the court's ruling on his amended motion *in limine* to bar the admission of the report regarding DNA evidence on the firearm, which the court denied.

¶ 9    On December 6, 2021, the trial court commenced defendant's jury trial. The State presented the testimony of the following: (1) Carolyn Woodward, Rebecca's mother; (2) Kraig Niewohner, Rebecca's ex-husband; (3) Jeremy; (4) Alexander Colbrook, special agent with the Illinois State Police; (5) Amanda Huston, Jeremy's wife; (6) Chief Norris; (7) Officer Rauch;

(8) Trooper Field; (9) Jess Bond, Mt. Sterling Police Sergeant; (10) Dr. Nathaniel Patterson, forensic pathologist; and (11) Shelby Sutherland, forensic scientist. The State also presented, *inter alia*, the firearm, numerous photographs, the autopsy report, and the firearm DNA evidence report. Defendant testified on his own behalf and recalled Chief Norris, Trooper Field, and Agent Colbrook. Additionally, defendant presented the testimony of the following: (1) Kip Baumann, digital forensic examiner with the Illinois State Police; (2) Brian Gallaher, paramedic; (3) Amy Newton, paramedic; (4) David Logsdon, paramedic; (5) Hannah Brown, Brown County deputy sheriff; (6) Justin Oliver, Brown County chief deputy sheriff; (7) Hood; (8) Carol Dean, defendant's mother; (9) defendant's father; (10) Dr. Jane Turner, forensic pathologist; and (11) George Nichols, forensic pathologist. Defendant also presented numerous exhibits, including the recordings from Officer Rauch's squad car, Officer Rauch's report, text messages between Rebecca and others, Dr. Nichols's report, and the gunshot residue report.

¶ 10      Woodward testified Rebecca "did everything with her left hand." She also testified Rebecca had a daughter, Zoe, who was about to turn 13 years old. Kraig testified Rebecca was left-handed and he had purchased a left-handed compound bow for Rebecca.

¶ 11      Jeremy testified he received the call from defendant, who Jeremy described as his best friend, at around 9:10 p.m. During the call, defendant said he had shot Rebecca. Jeremy questioned whether defendant was "f***" with him, and defendant replied, "I wouldn't f*** with you about this." Defendant then stated, "[H]e was going to join her." According to Jeremy, defendant then got really quiet. Jeremy told him not to do anything and he was "going to come down." Defendant did not respond. Jeremy hung up and told his wife Amanda to call 9-1-1. Amanda testified she called 9-1-1 after defendant had called her husband and stated he killed Rebecca.

¶ 12   According to Jeremy's testimony, he left his home and called defendant's father. He told defendant's father to be outside and drove to his house. There, Jeremy told defendant's father what defendant had stated. Jeremy and defendant's father then went to defendant and Rebecca's residence. At the residence, they entered through the back door. Jeremy observed Rebecca lying in a large pool of blood and not moving. When he walked into the living room, Jeremy saw the firearm and defendant kneeling on the floor with his face in his hands. In court, Jeremy identified the firearm (State's exhibit No. 1) as defendant's pistol. Jeremy testified he picked the firearm up with two hands and using two fingers on each hand. The prosecutor described Jeremy's demonstration as "a thumb on top of the grip on top of the side of the grip." Jeremy set the firearm on the kitchen countertop. He did not wipe the gun.

¶ 13   Additionally, Jeremy testified he visited defendant three different times in the hospital. Jeremy testified Hannah Brown might have been at the first visit. Defendant could not communicate until the last visit, which Jeremy believed was on July 17, 2019. He was not exactly sure of the date but knew it was the week before defendant was arraigned. Several other people were also in defendant's hospital room. During the visit, Jeremy was standing to the left of defendant, who was sitting in his hospital bed. Defendant wrote on a white board and made gestures. Jeremy testified the first thing defendant wrote to Jeremy was "I'm sorry." After some light banter, defendant also wrote the following things: "things were bad that night," "they had been arguing," "he killed her," and "he called [Jeremy] after he had went outside." Defendant made gestures after each written statement. Jeremy could not recall if he told Chief Norris about defendant's written statements when they spoke in January 2021. Moreover, after defendant left the hospital and was on house arrest, defendant sent Jeremy several messages through Facebook messenger. (The dates of the messages are not visible on the trial exhibits contained in the

appellate record.)  In the messages contained in State's exhibit No. 2-A, defendant stated, "Just wish the whole accident didn't happen.  I don[']t know why it went off."  In State's exhibit No. 2-B, defendant stated, "I never meant to hurt her.  I accidentally killed my best friend.  I wanted to die so bad."  Last, in State's exhibit No. 2-C, defendant stated, "Not much evidence to say I murdered [Rebecca].  It was just a damned accident.  I don[']t remember calling you.  I was in shock I guess."

¶ 14        Officer Rauch testified he was the first police officer on the scene and entered the house with emergency medical services (EMS).  He observed the firearm on the kitchen counter peninsula.  Officer Rauch took the weapon to his squad car where he unloaded it, made sure the firearm was safe, secured it, and locked it in the squad car.  The firearm remained in his squad car until he transferred the firearm to Trooper Field.  Officer Rauch could not recall if he stated his cameras were not working that night.

¶ 15        On cross-examination, Officer Rauch admitted he went into the Mt. Sterling Police Department in August 2021 even though he no longer worked there and added two pieces of information to his June 2019 police report.  First, Officer Rauch added he asked defendant, who was being treated by paramedics at the time, whether there was a child in the house, and defendant shook his head indicating "no."  Second, he asked defendant if he shot the woman, and defendant shook his head indicating "yes."  However, Officer Rauch admitted his application for a search warrant for the residence did not include defendant acknowledging he shot Rebecca.  Officer Rauch testified the State did not tell him he would not be prosecuted for altering his police report.

¶ 16        Trooper Field testified she investigated the crime scene in this case.  While she was in the living room, Officer Rauch brought a firearm to her.  He told her the firearm had been

secured in his vehicle. Trooper Field could not recall if Officer Rauch was wearing gloves but recalled she was wearing gloves when she took possession of the firearm. Along with the firearm, she received one loose bullet and a magazine containing four more bullets. When she received the firearm, the slide was back, and she observed a blood-like substance on the firearm. Trooper Field then photographed the firearm, and two of those photographs were admitted into evidence. After photographing the firearm, she secured it in a box and put the box with the other exhibits she had already packaged and collected. When she was done, Trooper Field gave the firearm to Sergeant Jess Bond with the Mt. Sterling Police Department. Trooper Field's report, which was admitted into evidence stated, *inter alia*, the firearm was "unloaded and secured by EMS" and "secured in the squad of Officer Rauch who was on scene." She testified she received the aforementioned information from Officer Rauch.

¶ 17        Sergeant Bond testified he took the firearm in question into custody from Trooper Field, entered it into the evidence book, and placed it in the evidence locker at the Mt. Sterling Police Department. The firearm was removed from the locker for viewing by the state's attorney and defense counsel. It was also removed for defense testing and given to Hood. Sergeant Bond explained the packaging of the firearm contained a chain of custody document and the evidence book contained a paper trail for the changes of custody of the firearm.

¶ 18        After Sergeant Bond's testimony, defendant renewed his motion *in limine* regarding the DNA evidence from the firearm. The trial court again denied defendant's motion finding the State had made a *prima facie* showing it had taken reasonable measures to preserve the integrity of the DNA on the firearm. The court noted the points raised by defendant went more to the weight to be given the evidence by the jury than the admissibility of the evidence.

¶ 19        Dr. Patterson testified he performed Rebecca's autopsy and opined she died of a

gunshot wound to the head. He explained the entrance wound was on the right side of Rebecca's head behind her ear and the exit wound was on her left temple. The trajectory of the bullet was "slightly downward" and "slightly from back to front." Additionally, Dr. Patterson observed an abrasion around the entrance wound, which was caused from contact with the muzzle of a firearm.

¶ 20        The State's last witness was Sutherland, who was employed by Independent Forensics of Illinois and accepted by the trial court as an expert in forensic DNA analysis. She received the firearm in this case from Hood in July 2020. After examining the firearm, Sutherland tested three locations, which were (1) the grip, (2) the slide, and (3) the trigger. She also tested three stains on the firearm, and those were located on (1) the right trigger guard, (2) the left trigger guard, and (3) the muzzle along with the interior of the barrel. Additionally, she received DNA samples from Rebecca and defendant to compare against the samples from the firearm.

¶ 21        As to the results, Sutherland testified none of the six tested locations yielded DNA profiles that could be attributed to Rebecca. The tests on the trigger, grip, and slide produced two DNA profiles, a minor contributor and a major contributor. When comparing defendant's DNA profile to the major contributor profile, defendant "could not be excluded as a contributor." The minor contributor from the grip and trigger was male. For the slide, the minor contributor was of an unknown sex, and the profile was not suitable for comparison. Sutherland further testified all of the stains were consistent with "originating from a single male contributor," and defendant could not be excluded as the contributor.

¶ 22        Additionally, Sutherland testified the handling of the firearm could remove or transfer DNA on the firearm. The less an item is handled, the more DNA is preserved.

Sutherland would expect a first handler's DNA to lessen the longer and more rigorously a second person handled the item. Sutherland also testified, despite no DNA-based evidence showing Rebecca handled the firearm, Sutherland could not say Rebecca did not handle the firearm.

¶ 23 After Sutherland's testimony, the State rested. Defendant made a motion for a directed verdict, which the trial court denied.

¶ 24 Defendant presented the testimony of Gallaher, Newton, and Logsdon, who were all paramedics at the scene. They all testified they did not enter the residence until it was determined to be safe. Additionally, none of the three saw a firearm and thus did not touch the firearm at issue.

¶ 25 Defendant also recalled Trooper Field. She testified about the photographs she took at the crime scene. Some of the photographs were of a dresser containing women's apparel. Inside the top drawer of the dresser were prescription medication bottles. Trooper Field removed the bottles and set them on top of the dresser to be photographed. The photographs were admitted into evidence. All of the bottles bore Rebecca's name. One bottle lacked a lid and contained a green leafy substance, which Trooper Field believed was cannabis. The other bottles had lids and stated the following medications: (1) clonazepam (2 bottles), (2) atomoxetine (generic of Strattera), (3) fluoxetine, (4) trazodone, (5) zolpidem, and (6) hydroxyzine. Trooper Field testified normally medications went with the body to the autopsy. Trooper Field uploaded the photographs into a system that would have been available to the crime scene technician at Rebecca's autopsy.

¶ 26 Deputy Brown testified, on June 25, 2019, she was asked to stand by at a property exchange at defendant and Rebecca's residence. Kraig was there to put Rebecca's items into boxes. While in the residence, he found Rebecca's prescriptions and the cannabis. Kraig asked

Deputy Brown to take possession of the items. She placed the items into an evidence bag. At the direction of Officer Rauch, she took them back to the sheriff's office for them to be processed into evidence there. The items sat in the sheriff's office for a while before she was asked to process the items into evidence. Chief Deputy Oliver testified he asked Deputy Brown to process the items in September 2019. After they were processed, he arranged for the items to be transported to the Mt. Sterling Police Department.

¶ 27        Deputy Brown also testified she knew defendant because he gave her a job when she was in high school. She and a group of people, including Jeremy, went to the hospital to visit defendant. During the visit, defendant did not communicate other than via gestures. Deputy Brown testified she did not observe defendant write anything on a white board.

¶ 28        Chief Norris testified he received the prescription medications and related items from the sheriff's office. At the request of the state's attorney, he photographed and documented what was in each bottle. Dr. Michael Gadsen was the prescriber of the prescriptions, which were filled on May 22, 2019. One prescription bottle was "Lithium carb tab 300 milligram," which contained 180 pills and still had the foil tab over the opening of the bottle.

¶ 29        Moreover, Chief Norris testified the search warrant application indicated the firearm was unloaded by EMS. He also testified he never heard Officer Rauch say he asked defendant on the night of the incident if he had shot Rebecca and the video and audio recordings from that night do not reflect such a statement. Chief Norris explained he had not initially reviewed the recordings because Officer Rauch had stated, on the night of the incident, his recording system was not working. Moreover, Chief Norris testified Officer Rauch did not have permission to enter the Mt. Sterling Police Department and change his report. He also testified the firearm at issue had the thumb safety on its left-hand side, so it would usually be operated

with the thumb when held in the right hand. Additionally, Chief Norris interviewed Jeremy on January 6, 2021. During the interview, Jeremy stated he visited defendant in the hospital on June 19, 26, and 30, 2019. While Jeremy said defendant wrote on a white board, he never said defendant wrote he killed Rebecca.

¶ 30 Agent Colbrook testified Rebecca's cell phone was given to the Illinois State Police's digital crimes unit for information extraction. The extraction covered the period of July 19, 2018, to June 12, 2019. Agent Colbrook reviewed the information and found only one series of text messages that "might have been indicative of some problem between" defendant and Rebecca. On May 7, 2019, Rebecca texted defendant, "Sorry we lost you." Twenty minutes later, Rebecca texted defendant saying, "I see where I rank," and then texted the following: "You made your choice very clear. Thanks for doing it here." Less than two minutes later, defendant responded, "I'm coming over in a minute, hold on." (The evidence showed they were on a family trip in Hawaii at the time of the text messages.)

¶ 31 Agent Colbrook testified about other text messages on Rebecca's cell phone. On June 11, 2019, which was three days before the incident, Rebecca texted Laura Gram, "I need help. My mind is so f*** up. I don't know what to do." When Gram asked what was wrong, Rebecca responded, "I hate living." Gram asked again, "why what[']s going on [Rebecca]," and Rebecca texted the following:

> "Just people. Kraig would rather pay the y money and not send Zoe there than help me out. For day amp [*sic*]. Dick head move. My mom is just in her own world loving on my niece and nephew and piss on me. It just hurts. I yell at Zoe because I'm f*** up and that tears me apart. Stupid stuff."

Rebecca followed up with the following message: "Plus I don't really like Mike right now and

just want to be alone."

¶ 32        Almost a month before the incident, on May 17, 2019, Rebecca contacted Michael Gadson by text message and inquired about her June prescriptions she was due to receive in the mail. The prescriptions noted in the text message were for Strattera, lithium, and clonazepam. There were also several text messages of note in April 2019. On April 4, 2019, Rebecca messaged Stacey Schnelle the following: "I'm sorry about earlier Stacey. I have had three really rough days. I went cold turkey off my medicine and start a new one. I have never felt so scared before it was horrible." The next day, Rebecca messaged her mother: "Dr. changed my meds. It's been rough[.]" She later sent her mother an attachment and texted, "Would you mind readeing [*sic*] this. It might help to try understand what I live with. It sucks. People's comments are really good." On April 19, 2019, Rebecca complained in a message about Zoe's attitude and her own poor reaction to that behavior, noting she would get mad and be in bed for days.

¶ 33        Hood was certified as an expert in firearms, blood stain pattern and blood spatter analysis, and crime scene processing. The defense hired him as a forensic consultant. Hood testified no one should have touched the firearm before the crime scene investigator arrived. He also explained how gunshot residue evidence was collected and preserved. Hood explained the back of the hand and the web of the hand were dabbed. A separate collection device was used for each hand. Additionally, Hood testified he observed a blood stain pattern on Rebecca's right index finger. He opined the blood stain pattern was caused by the inside of the trigger guard on the firearm.

¶ 34        Defendant presented two experts in forensic pathology who opined Rebecca's manner of death was suicide. Dr. Nichols testified he was retained by the defense in May 2020.

He explained the gunshot residue testing showed residue being present on the backs of both of Rebecca's hands. The right hand had significantly more gunshot residue than the left hand. Those results showed both hands were near the emission of the residue with the right hand being closer. Dr. Nichols agreed the results were consistent with a semiautomatic pistol with an ejection torque on the right side. He testified his opinion of suicide was based on the contact gunshot wound and the gunshot residue present on both hands, with more predominately on the right hand. Dr. Nichols did not know Rebecca was left-handed when he considered the evidence in this case. Additionally, Dr. Nichols testified it was not unusual for a female to commit suicide with a firearm. However, he acknowledged in the vast majority of suicides the dominant hand is the one used to discharge the weapon. Dr. Nichols also acknowledged, if the gunshot residue got through an assailant's hands, then the gunshot residue could have gotten on the back of the hands through a defensive move. He believed the high quantities of gunshot residue were more indicative of the hands being around the weapon when it was fired. Dr. Nichols also testified the contact gunshot wound was consistent with both suicide and assassination. He noted homicide by a contact gunshot wound was extremely rare in the United States. In 95 to 98% of cases, a contact gunshot wound to the head was suicide.

¶ 35   Dr. Turner testified the defense hired her in August 2021. In addition to reviewing the records relating to Rebecca's death, she reviewed Physician's Desk Reference guides explaining the purpose of the medications found in Rebecca's dresser. She explained lithium is used to treat "bipolar disorder including acute mania and maintenance therapy." Additionally, the medical literature indicates "primarily lithium is beneficial in preventing suicide." Dr. Turner also explained "the incidence of suicide is higher among persons who are afflicted with bipolar disorder than with persons who are not." She opined Rebecca had not been

taking her lithium for approximately three weeks before her death based on the facts Rebecca had her lithium prescription filled on May 22, 2019, but the bottle was still sealed closed. Rebecca's other medications were used to treat attention-deficit/hyperactivity disorder, panic disorder, depression, insomnia, and anxiety.

¶ 36 Moreover, Dr. Turner explained forensic pathologists commonly employ a suicide checklist in determining a manner of death. In conducting the suicide checklist, Dr. Turner reviewed text messages between Rebecca and her friends and relatives, including defendant. Dr. Turner was looking for stressors present in Rebecca's life, in particular what stressors were present in the days leading up to her death. Dr. Turner found the following:

"Well expressions of anger. Statement—a statement she made stating that she wanted to die. Some challenges in relationships. Her—the problems that she was experiencing in her relationship with [defendant] because of her alcohol dependency. Challenges with her chronic headaches. She had migraine headaches and challenges with her bipolar disorder."

Dr. Turner highlighted Rebecca's June 11, 2019, messages with Gram, in which Rebecca indicated she wanted to die. She found it was evidence of Rebecca's intent to commit suicide.

¶ 37 Dr. Turner also highlighted other evidence suggesting a self-inflicted gunshot wound. Like Dr. Nichols, Dr. Turner noted the contact gunshot wound and the gunshot residue results. However, unlike Dr. Nichols, Dr. Turner was aware Rebecca was left-handed. In her research, Dr. Turner learned handedness "doesn't necessarily dictate what side of the body someone may shoot themselves on in suicide." She noted a study in which 25 left-handed people shot themselves and 8 of those people shot themselves on the right side of their body. Dr. Turner testified about another study which found only 5 to 8% of people self-inflict wounds on the other

side of their body from the dominant hand. Dr. Turner acknowledged nondominant-hand shootings were less common and, in one of the studies she relied upon, there was no suspicion of foul play in any of the cases studied. Moreover, Dr. Turner observed the blood patterns on Rebecca's right index finger were "consistent with finger on a trigger of a gun." Additionally, Dr. Turner noted only 20 to 30% of American firearm suicides involved females. She also testified about a study which indicated a bullet path directed anteriorly was more indicative of homicide.

¶ 38 Defendant's mother, Carol, testified, on April 17, 2020, she asked defendant if the incident was really a suicide or whether he had shot and killed Rebecca. Her question had been prompted by a preliminary report from a pathologist in Chicago, Dr. Teas, who had stated in the report suicide could not be ruled out. In reply to the question, defendant would not look at her and stated, "It was not a suicide, that he had shot her." The following day, defendant came upstairs and was crying. Defendant sat down and said he had something to tell his parents. Defendant stated he "did not shoot her, that she had shot herself." Carol told defendant his attorney needed to be told that information. Defendant also told Carol he had texted his childhood friend, Brent Bulva, about the incident. Carol testified defendant told her he had explained to Bulva that Rebecca had shot herself and he did not want Zoe to know what happened, so he shot himself. Additionally, Carol acknowledged she had talked with Rebecca prior to the incident about plans for Father's Day, and Rebecca did not appear to be planning on being dead by Father's Day.

¶ 39 Defendant's father gave testimony similar to Carol's regarding how defendant told them he had not shot Rebecca but instead she had shot herself. He also testified about his family vacation to Hawaii, which included defendant, Rebecca, and Zoe. While sightseeing, he

observed an interaction that was unusual to him between Rebecca and Zoe, in which Zoe hugged Rebecca and Rebecca "pushed her away and told her to leave her alone." He had never seen Rebecca behave like that before. Defendant's father also testified as to the positive relationship between defendant and Zoe. Additionally, defendant's father testified defendant had broken his left arm and the day of Rebecca's death was defendant's first day back at work. At 5 p.m. when work ended, they left the shop together, and defendant was in great spirits. Defendant reminded him he and Rebecca were expecting him for Father's Day dinner that weekend. At 8:46 p.m., defendant's father texted defendant about a pump they were planning to buy for the shop. Defendant gave an unremarkable response.

¶ 40 Defendant testified he met Rebecca in 2012 and they began living together in late spring 2017. Rebecca's daughter Zoe also lived with them. Defendant stated Rebecca and Zoe were his pride and joy. Defendant described Rebecca as being "left-hand dominant."

¶ 41 As to the firearm used in this case, defendant testified he and Rebecca kept the pistol in a gun safe in their bedroom with an empty chamber but a loaded magazine. Defendant taught Rebecca everything about the firearm, and they used the firearm's light as the main flashlight in the home. The firearm was a right-handed action pistol, with the thumb safety and magazine release on the left side and the ejection port on the right side. According to defendant, Rebecca shot the firearm with her right hand because she could not stand having the rounds flying into her face.

¶ 42 Regarding his relationship with Rebecca, defendant testified they got along "reasonably well" but had some disagreements. He described Rebecca as a "sick girl, overly anxious." She would get upset, and he would help console and comfort her. Defendant testified about some examples of her "mental health issues." He noted she did not handle plans changing

well.

¶ 43    In addition to his regular work duties on June 14, 2019, defendant worked on repairing a used firearm scope, which he hoped to attach to the firearm used in this case. When he got home after work that day, defendant noticed Rebecca was "a little agitated" because chores needed to be done to prepare for Father's Day and "the girls" had left the pool area messy. Defendant emptied his pockets on the kitchen counter, which included the scope for the firearm. He then went outside and did chores until around 8:30 p.m. After that, he received a text message from his father about a part for a machine at the shop. Defendant responded he would check the next morning because he and Rebecca had plans to go shopping. He completed his communication with his father shortly before 9 p.m. Defendant then sat down on the couch with a beer.

¶ 44    Rebecca was unhappy with defendant for leaving his things on the kitchen counter because she had cleaned that day. She told him to pick up his things, and he refused. Rebecca then "whacked" the scope off of the counter. Defendant got up off the couch and told her he would take care of the scope. Defendant then walked to the bedroom, removed the firearm from the gun safe, and took it to the kitchen. Rebecca was following him the whole time but was starting to settle down as she saw defendant was doing what he was told.

¶ 45    Defendant further testified, in the kitchen, he laid the firearm next to the scope on the counter. He then went to grab a bottle opener, but the opener was not on the counter where he had left it. Defendant "made a smart-ass comment about not leaving things the way they are, what's the big d*** deal about the bottle opener being on the counter." Rebecca did not respond to the comment. Defendant then walked around the kitchen counter and opened the drawer with the bottle opener. Defendant gave the following testimony about the ensuing events:

"A. I heard the—the slide—I heard the slide operate on my pistol, and my blood ran cold. I thought I was a dead man.

Q. So you still had your back to [Rebecca]?

A. Yes, sir.

Q. Did you turn around?

A. I—I turned around, expected to see the muzzle of the firearm, but it wasn't pointed at me.

Q. Where was it pointed?

A. She had the pistol (demonstrating) pointing at her head.

Q. And what then did you do?

A. So I said, f*** put it down, you're not going to do a goddamn thing.

Q. And what happened next?

A. The gun went off. She pulled the trigger."

Defendant further testified Rebecca fell to the floor, and he also fell down because he could not stand up. He then crawled over to Rebecca, took the gun away from her, and put it on the counter. He gave her a light hug and asked what they were going to do with Zoe because she was the only person left that mattered. He then told Rebecca to hang on because he was coming with her.

¶ 46        Defendant then stood up, grabbed the firearm, grabbed his cell phone, and called Jeremy because he was the only person he could trust. Defendant explained he did not want Zoe to walk in the next morning and find them and he knew Jeremy would take care of that. Defendant called Jeremy and said, "It was my fault. [Rebecca]'s dead. I killed her. It's my fault." Defendant explained he told Jeremy he killed Rebecca so Zoe would not know what

happened. After putting the cell phone down, he told Rebecca he was coming, took a step back, put the pistol under his chin, and pulled the trigger.

¶ 47 Defendant denied telling Jeremy with the white board in the hospital he had shot Rebecca. In fact, defendant messaged Jeremy after he got out of the hospital because he believed Jeremy knew what defendant had said was false. Thus, he told Jeremy it was an accident because he was still blaming himself. Defendant felt responsible for what happened and still did. Defendant testified he said the wrong things and did not "have to be an a*** that night."

¶ 48 Moreover, defendant testified he told his mother Rebecca's death was not a suicide in April 2020. He explained he did so to protect Zoe. However, after the conversation with his mother, he felt "[l]ike an a***," and he "couldn't even look at [his] mother in the face." Defendant was up most of the night because he felt the walls were coming down. He noted Dr. Teas's observation and what the investigators were finding did not support his version of what happened. Defendant messaged Bulva and asked for advice. He told Bulva he had lied to everyone about shooting Rebecca. Bulva asked what happened, and defendant responded as follows:

> "She shot herself. How it came about is true. I got the gun out to try the scope on it. We were fighting though. I layer [*sic*] the gun on the counter, then I turned around to get a bottle opener out of the drawer. I heard the slide rack on the pistol.
>
> I turned around and saw what was going on. She had it pointed at her head. I was a f*** g a***. I told her 'you won't f*** do it, put it down.' She looked me straight in the eyes and pulled the trigger."

Bulva then inquired if defendant's attorney knows that, and defendant replied as follows:

"Your [*sic*] the only one who knows. I don't want Zoe to know what

happened. I think I egged it on. I panicked, freaked out and needed to be with

her. I called Jeremy and told him I did it. I wasn't supposed to survive, and

nobody would have known.

But a couple of medical examiners are leaning towards suicide, and I feel

like I'm in a corner."

Bulva told defendant to call his lawyer and to talk to his parents. Defendant followed Bulva's

advice. After telling his parents and talking to his lawyer, defendant messaged Bulva again and

said the following:

"Mom feels better. Attorney feels better. I feel like I threw her under the

bus. Dad ain't saying much.

He looks pissed."

¶ 49 Additionally, defendant testified, in the past, Rebecca had threatened to leave

him. Defendant told her, while he wanted her to stay, she was "welcome to go at any time."

¶ 50 The State offered no evidence in rebuttal, and defendant renewed his motion for a

directed verdict, which the trial court denied.

¶ 51 During the jury instruction conference, defense counsel requested a lesser

included offense instruction on the offense of reckless conduct. The State disagreed it was a

proper instruction. The trial court found, when comparing elements of the charges and

considering the evidence presented in this case and the underlying charge, it was not appropriate

to grant the request to give an instruction on reckless conduct as a lesser included offense of first

degree murder.

¶ 52 Jury deliberations began a little after 11 a.m. on December 15, 2021. Around

1:25 p.m., the jury asked the following: " 'Could the jury be allowed to view the weapon to verify how it operates?' " The trial court proposed the following response:

> "Ladies and gentlemen of the jury, it would depart from acceptable protocols and practices to allow a weapon received into evidence to go back to the jury room during deliberations. The Court will not deviate from this, and the weapon in question will not be available for you in the jury room. Please continue with your deliberations."

The State did not object. Defense counsel stated he would like to give them a demonstration and objected to the firearm not going back to the jury. The court refused to allow the firearm to go back to the jury over defense counsel's objection. The jury did not reach a verdict that day and left the courthouse around 4:20 p.m.

¶ 53 The jury deliberations resumed at 9 a.m. on December 16, 2021. A little after 11 a.m. the jury asked the following question: " 'Could the jury see the gun's handle or grip to see how it has the dimples or groove spaces where the DNA would have been collected from?' " The trial court noted most judges do not let a firearm go back to the jury room because of the potential risks. However, it then recognized it was the second question and the second day of deliberations and thus was willing to listen to suggestions. The court noted it could let the firearm go back to the jury room since everyone had gone through a metal detector. The State noted a gunlock could be placed in the firearm, which would allow the jury to view the gun in a safer manner. Defense counsel stated to allow the firearm to go back to the jury room would be inconsistent with the ruling on the first question and the second question implied the jury wanted new evidence because no testimony was presented about the nature of the grip. Over defense counsel's objection, the court allowed the firearm to go back to the jury room with an

interlocking device that rendered the firearm inoperable. The court distinguished the jury's first question by noting that request posed a safety risk. Additionally, the court noted Sutherland, the forensic scientist who conducted the DNA analysis, testified about the locations on the firearm that she tested.

¶ 54 The trial court did not announce the time when it sent the locked firearm back to the jury room. At 11:30 a.m., the jury announced it had reached its verdict. The jury found defendant guilty of first degree murder.

¶ 55 On January 14, 2022, defendant filed a timely posttrial motion asserting the trial court made numerous errors. Those claims of error relevant to the appeal are the following: (1) the denial of both defendant's motion *in limine* regarding the DNA test results and his renewal of that motion during trial; (2) the denial of defendant's request for a lesser included offense instruction on reckless conduct; (3) the denial of both defendant's motion for a directed verdict at the close of the State's evidence and a renewal of that motion at the close of all of the evidence; (4) the granting of the jury's second request to have the firearm sent to the jury room; and (5) the allowance of the DNA report to be given to the jury during deliberations. Defendant filed an amended posttrial motion essentially raising the same issues. The State filed a written response asserting defendant's posttrial motion should be denied. On January 27, 2022, the court held a hearing on the posttrial motion. After hearing the parties' arguments, the court denied the motion.

¶ 56 The trial court held defendant's sentencing hearing on February 17, 2022. The State presented the presentence investigation report and the victim impact statements of Woodward and Rebecca's 13-year-old daughter, Zoe, both of which addressed the pain and hardships resulting from Rebecca's death. Defendant did not present any evidence in mitigation.

The State asked for a sentence of 60 years' imprisonment. Its request did not specifically address a firearm enhancement. Defense counsel requested a sentence of 20 years' imprisonment with a 25-year firearm enhancement for a total of 45 years' imprisonment. He recognized even that sentence was a life sentence. Defendant declined to make a statement in allocution. The court sentenced defendant to 40 years' imprisonment with a 25-year firearm enhancement. In explaining its sentence, the court stated the following:

> "Circling back around to the evidence that was presented in this case, it is not clear to me why you did what you did, [defendant]. Nonetheless, the evidence showed that you shot [Rebecca] in the head, that you unsuccessfully attempted to take your own life. And in doing what you did, you have robbed a child of a mother, taken [Rebecca] away from her family and friends, and for that, you are the one who is now held to account and that you would be paying the price of that with your freedom."

¶ 57 Defendant filed a timely motion to reconsider his sentence asserting it was excessive for many reasons. One of the reasons was the factors in aggravation considered by the trial court were inherent in the offense of first degree murder. He also filed a motion to reconsider the denial of his posttrial motion. On June 2, 2022, the court held a joint hearing on defendant's motions and denied both of them. As to sentencing, the court noted it considered the trial evidence and weighed it in the sentencing decision. The court highlighted (1) the senseless nature of the crime and defendant's actions and (2) "the long-range human cost," which included Rebecca's "young child" having to go forward without a mother.

¶ 58 On June 2, 2022, defendant filed a timely notice of appeal in compliance with Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021). Accordingly, this court has jurisdiction of

defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 59                                 II. ANALYSIS

¶ 60                          A. Sufficiency of the Evidence

¶ 61         On appeal, defendant first contends the State's evidence was insufficient to prove beyond a reasonable doubt he committed first degree murder. Our supreme court has set forth the following standard of review for insufficiency of the evidence claims:

> "It is well settled that, when reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Emphasis omitted.) [Citation.] All reasonable inferences from the evidence must be drawn in favor of the prosecution. [Citation.] This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25, 193 N.E.3d 1220.

¶ 62         Section 9-1(a)(1) of the Criminal Code of 2012 (Criminal Code) provides the following:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2018).

Defendant contends the State's evidence was insufficient to prove him guilty beyond a

reasonable doubt of the first degree murder of Rebecca, even before considering the evidence he presented at trial. The State disagrees.

¶ 63        In this case, defendant called his friend Jeremy and told him that he had just shot Rebecca. Thirteen days later, the State charged defendant with first degree murder for Rebecca's death. Defendant then did not tell anyone Rebecca committed suicide until 10 months later, which was after Dr. Teas's report finding suicide could not be ruled out. Those facts alone are sufficient to question the credibility of the defense's "compelling story."

¶ 64        The physical evidence and relevant circumstances do not fall squarely into either type of death, suicide or homicide. Defendant claims no expert testified the contact gunshot wound was indicative of anything other than suicide. However, Dr. Nichols testified it was consistent with both suicide and assassination. Thus, while most such contact wounds are from suicide, the contact wound did not rule out homicide. Defendant also notes the evidence was uncontroverted Rebecca had previously shot the firearm with her right hand. While that contention is based on defendant's own self-serving testimony and contrary to the testimony of Rebecca's mother and ex-husband she did everything left-handed, the experts agreed the dominant hand is used to discharge a firearm in the vast majority of suicides. Dr. Turner also testified the path of the bullet in this case was uncommon for a suicide and women were less likely to commit suicide with a firearm. Additionally, the blood stain pattern on Rebecca's right index finger was merely consistent with a finger on a trigger. As to the gunshot residue evidence, Dr. Nichols said it was possible the gunshot residue came from a defensive move. However, he believed, based on the quantities, it was more likely it came from her hands being on the weapon. Similarly, Sutherland, the State's DNA expert, testified, even though Rebecca's DNA was not found in the tested samples from the firearm, she could not say Rebecca never

touched the firearm.

¶ 65    Defendant's guilt or innocence depended on the resolution of the conflicts in the evidence, the credibility of the witnesses, and the weight given the witnesses' testimony. Those determinations fell exclusively within the province of the jury. *People v. Collins*, 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277 (1985). The jury was fully aware of how the firearm was handled after defendant shot himself and the inconsistencies with the physical evidence. Nevertheless, the jury chose to believe defendant's initial description of the incident. After reviewing the trial evidence, we do not find that conclusion was unreasonable.

¶ 66    Additionally, this case is distinguishable from *State v. Lodzinski*, 249 N.J. 116, 158, 265 A.3d 36, 60 (2021), where the out-of-state reviewing court found no rational jury without engaging in speculation or conjecture could conclude the defendant purposely or knowingly caused her son's death. Here, the State presented evidence, aside from defendant's initial statements, from which a jury could find defendant intentionally caused Rebecca's death.

¶ 67    Accordingly, the State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt of first degree murder.

¶ 68                 B. Lesser Included Offense Instruction

¶ 69    Defendant next argues the trial court erred when it refused defendant's request for a jury instruction on the lesser included offense of reckless conduct because the record contained substantial evidence defendant's actions endangered Rebecca's safety but did not proximately cause her death. The State contends, even assuming reckless conduct is a lesser included offense of first degree murder, the court's refusal was proper because the evidence does not establish each element of reckless conduct. In reply, defendant accepts the State's "concession" and contends the parties agree "reckless conduct" is a lesser included offense of first degree murder.

¶ 70　　　　　While we do not agree the State conceded reckless conduct is a lesser included offense of first degree murder as defendant argues, even if defendant is correct, a reviewing court is not bound by a party's concession. See *People v. Nunez*, 236 Ill. 2d 488, 493, 925 N.E.2d 1083, 1086 (2010). As such, we begin our analysis by first addressing whether reckless conduct is a lesser included offense of intentional first degree murder. See *People v. Kolton*, 219 Ill. 2d 353, 361, 848 N.E.2d 950, 955 (2006) (noting the two-step process and stating the examination of the evidence adduced at trial should not be undertaken unless and until it is first determined the uncharged offense is a lesser included offense of the charged crime). Section 2-9(a) of the Criminal Code defines an "included offense" as one which "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2018). Since the aforementioned definition "offers little guidance," our supreme court has determined the charging instrument approach is the proper analysis for determining a lesser included offense. *Kolton*, 219 Ill. 2d at 360-61, 848 N.E.2d at 954. With the charging instrument approach, courts look "to the allegations in the charging instrument to see whether the description of the greater offense contains a broad foundation or main outline of the lesser offense." (Internal quotation marks omitted.) *Kolton*, 219 Ill. 2d at 361, 848 N.E.2d at 954-55. Moreover, "under the charging instrument approach, an offense may be deemed a lesser-included offense even though every element of the lesser offense is not explicitly contained in the indictment, as long as the missing element can be reasonably inferred." *Kolton*, 219 Ill. 2d at 364, 848 N.E.2d at 956-57. Thus, the determination of whether a particular offense is a "lesser included" is made on a case-by-case basis using the information's or indictment's factual description of the charged offense. *Kolton*, 219 Ill. 2d at 367, 848 N.E.2d at 958. "Whether a charged offense encompasses

another as a lesser-included offense is a question of law, which this court reviews *de novo*."
*Kolton*, 219 Ill. 2d at 361, 848 N.E.2d at 955.

¶ 71       In this case, the State alleged defendant, without lawful justification and with the intent to kill Rebecca, shot Rebecca with .45-caliber handgun, thereby causing her death. See 720 ILCS 5/9-1(a)(1) (West 2018). Defendant notes a person commits reckless conduct if he by lawful or unlawful means recklessly performed an act or acts endangering the safety of another person. 720 ILCS 5/12-5(a)(1) (West 2018). His theory is he acted recklessly by placing a firearm within the reach of Rebecca, who he knew was suicidally depressed, and he spoke carelessly and callously when he saw her grab the gun. Thus, he did not cause Rebecca's death but endangered her safety.

¶ 72       "[T]he crime of reckless conduct is a broad, all-inclusive offense" and "is aimed primarily at the reckless homicide type of conduct where no homicide results." (Internal quotation marks omitted.) *People v. Peters*, 180 Ill. App. 3d 850, 853, 536 N.E.2d 465, 467 (1989). We note the other parts of the reckless conduct statute refer to some type of bodily harm but not death. In this case, the two statutes at issue address distinct situations; one addresses acts resulting in death and the other addresses acts not resulting in death. The information asserted a crime based on Rebecca's death by defendant shooting her. We do not find it reasonable to infer from the State's information a different act by defendant (placing a loaded pistol in front of Rebecca) or an act not causing Rebecca's death. Thus, under the facts of this case, reckless conduct is not a lesser included offense of first degree murder.

¶ 73       Additionally, this court has previously stated, when a person's conduct causes another's death, reckless conduct is not an appropriate charge. *People v. Mikel*, 73 Ill. App. 3d 16, 20-21, 391 N.E.2d 558, 562 (1979); see also *People v. Pumphrey*, 115 Ill. App. 3d 1031,

1033, 451 N.E.2d 961, 963 (1983) (noting, when a death occurs, a reckless conduct instruction is simply improper). In *Mikel*, 73 Ill. App. 3d at 17-18, 391 N.E.2d at 559-60, the defendant was found guilty of murder on an accountability theory, where he drove a vehicle in which the passenger shot and killed a person with the defendant's rifle. On appeal, the defendant argued the trial court erred by failing to instruct the jury on reckless conduct with respect to the killing and the other two charges. *Mikel*, 73 Ill. App. 3d at 20, 391 N.E.2d at 561. Specifically, he asserted "the evidence would support a jury verdict that he was guilty of reckless conduct in his own right by allowing someone to shoot a gun out of his truck window." *Mikel*, 73 Ill. App. 3d at 20, 391 N.E.2d at 562. This court noted the defendant was not charged with reckless conduct and reckless conduct is not a lesser included offense of murder. *Mikel*, 73 Ill. App. 3d at 20, 391 N.E.2d at 562. Moreover, we observe, "[t]he offense of involuntary manslaughter concerns the death of an individual while reckless conduct deals with the infliction of bodily harm." *People v. Johnson*, 32 Ill. App. 3d 36, 48, 335 N.E.2d 144, 154 (1975). When the State only charges an act causing death, reckless conduct is not a proper lesser included offense instruction.

¶ 74 Accordingly, the trial court properly denied giving defendant's reckless conduct instruction.

¶ 75 C. Other Trial Errors

¶ 76 Defendant further asserts he is entitled to a new trial based on the cumulative effect of the following alleged errors by the trial court: (1) the admission of DNA evidence, (2) the allowance of the DNA expert's report to go to the jury during deliberations, and (3) the allowance of the firearm to go to the jury room.

¶ 77 1. *DNA Evidence*

¶ 78 Defendant filed a motion *in limine* seeking to prohibit the introduction of DNA

test results recovered from the firearm, which the trial court denied. On appeal, defendant contends the court's denial was improper because of Officer Rauch's misconduct. The State asserts the denial was proper, noting the court relied on the video evidence and not Officer Rauch's testimony.

¶ 79 "When the State seeks to introduce an object into evidence, the State must lay an adequate foundation either through its identification by witnesses or through a chain of possession." (Internal quotation marks omitted.) *People v. Woods*, 214 Ill. 2d 455, 466, 828 N.E.2d 247, 254 (2005). If the physical evidence is not readily identifiable or may be susceptible to tampering, contamination, or exchange, the State is required to establish a chain of custody. *Woods*, 214 Ill. 2d at 467, 828 N.E.2d at 255. The State has the burden of making a *prima facie* showing the chain of custody for the object is sufficient by establishing reasonable protective measures were taken to ensure the object has not been tampered with, substituted, or altered between the time of seizure and forensic testing. *Woods*, 214 Ill. 2d at 468, 828 N.E.2d at 255. Once the State establishes a *prima facie* case, the burden then shifts to the defendant to produce evidence of actual tampering, alteration, or substitution. *Woods*, 214 Ill. 2d at 468, 828 N.E.2d at 255. Unless the defendant produces evidence of actual tampering, substitution, or contamination, a sufficiently complete chain of custody requires neither the testimony of every person in the chain nor the exclusion of every possibility of tampering or contamination. *People v. Blankenship*, 406 Ill. App. 3d 578, 588, 943 N.E.2d 1111, 1119 (2010). Additionally, absent actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence. *Blankenship*, 406 Ill. App. 3d at 588, 943 N.E.2d at 1119.

¶ 80 Defendant contends the DNA evidence should have been inadmissible because

the chain of custody depends on a police officer who committed "truly remarkable misconduct." His arguments go to the credibility of Officer Rauch. In ruling on the motion *in limine*, the trial court agreed with defense counsel Officer Rauch lacked credibility at that point. However, as the trial court noted, it was able to observe the video with audio of Officer Rauch's handling of the firearm at the crime scene. The court was not convinced the integrity of the evidence seized was disrupted to the point it should be inadmissible. Defendant's contention it was tampered with is based purely on conjecture due to Officer Rauch's lack of credibility. No evidence exists Officer Rauch touched the firearm while it was on the floorboard of his locked squad car. We find defendant failed to establish the trial court abused its discretion by declining to bar the admission of the DNA report.

¶ 81                                  2. *DNA Expert's Report*

¶ 82          At trial, defendant objected to Sutherland's report on the DNA evidence going back to the jury room because it contained information not presented during the trial. The trial court allowed the report to go back to the jury room, noting the report had been admitted into evidence. On appeal, defendant asserts the court erred by doing so.

¶ 83          The determination of whether to allow exhibits to go to the jury room rests within the trial court's sound discretion. *People v. White*, 2011 IL App (1st) 092852, ¶ 59, 963 N.E.2d 994. "We will not reverse that decision unless there is an abuse of discretion to the prejudice of the defendant." *People v. McDonald*, 329 Ill. App. 3d 938, 948, 769 N.E.2d 1008, 1016 (2002). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1, 5 (2009).

¶ 84          Defendant cites *Lawson v. G. D. Searle & Co.*, 64 Ill. 2d 543, 556, 356 N.E.2d

779, 786 (1976), in which our supreme court found an exhibit should not have gone back to the jury room. The exhibit was an 88-page booklet on oral contraceptives compiled by the Food and Drug Administration's Advisory Committee on Obstetrics and Gynecology and contained considerable material irrelevant to the issues in the case. *Lawson*, 64 Ill. 2d at 553, 556, 356 N.E.2d at 784, 786. He also cites *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 14, 772 N.E.2d 967, 972 (2002), in which the reviewing court found the trial court did not abuse its discretion by refusing to allow the physician's medical records to be submitted to the jury.

¶ 85        Here, the DNA report was not even six full pages long and contained mostly information Sutherland explained during her testimony. As such, we do not find the trial court abused its discretion by allowing the DNA report to go back to the jury room.

¶ 86                                    3. *Firearm*

¶ 87        Defendant also contends the trial court erred by allowing the firearm to go back to the jury room after it denied the jury's first request. The State asserts the circumstances were different.

¶ 88        With its first question, the jury asked to be " 'allowed to view the weapon to verify how it operates.' " The trial court immediately indicated it would be a departure from acceptable protocols and practices to allow the firearm to go to the jury room. The State did not object, and defense counsel noted he would like to give them a demonstration and objected to the court's proposal. The jury's second question was asked on the next calendar day, and the jury requested to " 'see the gun's handle or grip to see how it has the dimples or groove spaces where the DNA would have been collected from.' " In response to the second question, the court was willing to listen to suggestions. The court noted, if it granted the request, it did not think a safety issue would exist. The State agreed the grip could be viewed in a safe manner. Defense counsel

asserted allowing the firearm to go back to the jury room would be inconsistent with the ruling on the first question and the question indicated the jury was attempting to gather new evidence. The court allowed the firearm to go back with trigger and barrel locks.

¶ 89        We disagree with defendant's suggestion the trial court denied the first request because the request favored the defense and granted the second request because it favored the State. The jury's first request to view the gun clearly presented a safety risk given the jurors desired to see how the gun operated. The second request could be accomplished safely with the firearm secured with locks. Moreover, the photographs of the firearm admitted into evidence show the grip had a different surface. The court declined to ponder the jury's motivation for its request, and defendant cites no authority for why that approach was incorrect.

¶ 90        Accordingly, we do not find defendant has established the trial court abused its discretion by allowing the firearm with the locks to go back to the jury room. Additionally, since we have not found any errors, we do not address defendant's cumulative error argument.

¶ 91                                D. Sentencing

¶ 92        Last, defendant argues his sentence should be reduced or he should receive a new sentencing hearing because the trial court (1) considered a factor inherent in the offense of first degree murder and (2) treated the State's decision not to prove a motive as aggravating. Defendant recognizes he did not raise his motive argument in the trial court and contends we should review that issue under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).

¶ 93        The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

        "(1) a clear or obvious error occurred and the evidence is so closely balanced that
        the error alone threatened to tip the scales of justice against the defendant,

- 33 -

regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

¶ 94 We begin a plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059. The alleged errors defendant raises are essentially claims the trial court imposed an excessive sentence. See *People v. Johnson*, 2019 IL 122956, ¶ 39, 129 N.E.3d 1239 (noting the defendant raised an excessive sentencing argument when the defendant argued he would have received a lower sentence if the court had not erred in its application of the statute and, thus, erroneously considered statutory factors). With excessive sentence claims, this court has explained appellate review of a defendant's sentence as follows:

"A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case. [Citation.] Thus, the trial court is the proper forum for the determination of a defendant's sentence, and the trial court's decisions in regard to sentencing are entitled to great deference and weight. [Citation.] Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. [Citation.] If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the

spirit and purpose of the law or is manifestly disproportionate to the nature of the

offense." (Internal quotation marks omitted.) *People v. Price*, 2011 IL App (4th)

100311, ¶ 36, 958 N.E.2d 341.

See also *People v. Alexander*, 239 Ill. 2d 205, 212-13, 940 N.E.2d 1062, 1066 (2010). The

sentencing range for first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) is 20 to 60 years'

imprisonment (730 ILCS 5/5-4.5-20(a) (West 2018) (text of section effective June 1, 2019)).

Defendant was also subject to a 25-year-to-life firearm enhancement for personally discharging a

firearm that caused great bodily harm, permanent disfigurement, or death to the victim. 730

ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018) (text of section effective June 1, 2019). Accordingly, the

trial court's 40-year sentence with a 25-year firearm enhancement was within the proper

sentencing range.

¶ 95                                    1. *Inherent Factor*

¶ 96        Defendant contends the trial court improperly considered the fact defendant's

conduct had taken Rebecca away from her daughter, family, and friends. The State asserts the

court's finding is not inherent in the offense of murder.

¶ 97        The trial court must not consider an element that is inherent in the offense as an

aggravating factor when sentencing a defendant. *People v. Brown*, 2019 IL App (5th) 160329,

¶ 18, 145 N.E.3d 486. "Nevertheless, the trial judge 'need not unrealistically avoid any mention

of such inherent factors, treating them as if they did not exist.' " *Brown*, 2019 IL App (5th)

160329, ¶ 18 (quoting *People v. O'Toole*, 226 Ill. App. 3d 974, 992, 590 N.E.2d 950, 962

(1992)). When reviewing a sentence for an alleged error based upon the consideration of an

improper factor in aggravation, the reviewing court considers the record as a whole and does not

focus merely on a few words or statements by the trial judge. *Brown*, 2019 IL App (5th) 160329,

¶ 18.   We note "[a]n isolated remark made in passing, even though improper, does not necessarily require that [the] defendant be resentenced."  (Internal quotation marks omitted.) *Brown*, 2019 IL App (5th) 160329, ¶ 18.  To receive a new sentencing hearing, the defendant must show more than the mere mentioning of the improper factor in aggravation; rather, the defendant must demonstrate the trial judge relied upon the improper factor in fashioning the defendant's sentence.  *Brown*, 2019 IL App (5th) 160329, ¶ 18.

¶ 98        In this case, the trial court explicitly stated it was not considering the elements of the offense as aggravating factors in sentencing defendant.  The court then went through the mitigating and aggravating factors.  After discussing those factors, it then discussed the evidence presented at trial, which included the impact of Rebecca's death on her daughter, family, and friends.

¶ 99        In *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 116, 133 N.E.3d 641, the defendant argued the trial court violated the rule against double enhancement in sentencing the defendant by considering, as an aggravating factor, the pain the victim's murder caused to her family.  This court noted the victim's death and serious harm to the victim are implicit in the offense of murder.  *Kelley*, 2019 IL App (4th) 160598, ¶ 117.  We explained, however, "the grief of surviving family members, though a common result of murder, is not implicit in murder itself."  *Kelley*, 2019 IL App (4th) 160598, ¶ 117.  For example, the murder victim might have no family, or the victim's family might be indifferent.  *Kelley*, 2019 IL App (4th) 160598, ¶ 117.  In other words, a deleterious effect on the murder victim's family is a frequent consequence of the murder, but it is not something inherent in the murder itself.  *Kelley*, 2019 IL App (4th) 160598, ¶ 117.  Accordingly, we disagreed with the defendant and found no double enhancement.  *Kelley*, 2019 IL App (4th) 160598, ¶ 117.

¶ 100    In *People v. Jeffers*, 2022 IL App (2d) 210236, ¶ 29, the reviewing court cited *Kelley* and found the trial court properly considered the detrimental effects on the victims' families. We note our analysis in *Kelley* did not mention the gruesome nature of the victim's death but, rather, explained how the effect on the family was separate from the murder itself. Additionally, as noted in *Kelley*, the detrimental effect on the victim's family is different from the defendant causing harm to the victim. *Kelley*, 2019 IL App (4th) 160598, ¶ 117. As such, the finding of a double enhancement in *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 14, 58 N.E.3d 661, cited by defendant, is distinguishable from this case because the court addressed the harm caused to the victim. Moreover, the case of *People v. Townsend*, 2023 IL App (1st) 200911, ¶ 6, cited by defendant was modified and superseded on rehearing, and the new opinion did not reach the defendant's sentencing issue. Defendant asks us to consider the superseded analysis as persuasive authority, but we decline to do so. We find *Kelley* was properly decided and do not find the trial court's comments about Rebecca's family was an improper double enhancement.

¶ 101                                    2. *Motive*

¶ 102    Defendant last asserts the trial court erred by commenting "it [was] not clear to me why you did what you did" in explaining defendant's sentence. During the hearing on defendant's motion to reconsider his sentence, the court explained its aforementioned comment was on the senseless nature of defendant's actions and the crime. The State asserts the court's comment was not erroneous.

¶ 103    Defendant asserts error based on the decision in *Townsend*, which was later superseded. Furthermore, defendant's second prong plain-error analysis is based on this court finding the consideration of the impact on Rebecca's family was erroneous. However, we found

that consideration was proper.  Thus, even if we found the trial court's consideration of the senseless nature of the crime was improper, defendant failed to establish second prong plain error.  Accordingly, defendant is not entitled to a sentence reduction or a new sentencing hearing.

¶ 104                                    III. CONCLUSION

¶ 105          For the reasons stated, we affirm the Brown County circuit court's judgment.

¶ 106          Affirmed.